. MILLER v. UNIVERSITY MAGAZINE CO. et al.

(Supreme Court, Special Term, New York County.    November, 1894.)

CORPORATIONS—ACTION BY STOCKHOLDERS—EXCESSIVE ISSUE OF STOCK.

Where a corporation issued its entire stock in payment for property at an excessive valuation, a subsequent purchaser of part of the stock, though without notice of that fact, cannot sue to compel the return of so much of the stock as exceeded the value of the property, as the corporation itself has no cause of action therefor.

Action by Marion M. Miller against the University Magazine Company and others to cancel certain shares of stock.    Complaint dismissed.

T. M. Tyng, for plaintiff.

G. B. Merrill, for defendants.

O'BRIEN, J.    The defendant the University Magazine Company is a corporation organized under the laws of this state on the 9th day of December, 1890, for the purpose of publishing and printing a monthly magazine.    The capital stock is $50,000, divided into 5,000 shares of $10 each.    At the first meeting there was adopted a resolution in the following words:

"Whereas, the plant of the University Magazine is necessary for the purposes of the company; and whereas, Mr. Thomas Winsor is the sole owner of the same; therefore, be it resolved that the entire capital stock be issued to Mr. Winsor for his interest therein."

The question arises whether the certificate for such stock was ever delivered, no receipt for the same appearing on the company's certificate book; but from the fact that a blank power of attorney to transfer the same, signed by Winsor, appears on the book, and is marked "canceled," I shall assume that it was delivered by the company, received by Winsor, and returned in exchange for the certificates thereafter issued.    The plant of the University Magazine referred to in the resolution, for which the capital stock was issued, consisted of certain books, records, and papers, good will, advertising contracts, and subscribers' list belonging to a former insolvent corporation called the Collegian Publishing Company, which had been purchased at a sheriff's sale, in the previous June, by the defendant Eliot, for $5.    On the same day he assigned his purchase to the defendant Brooks by an instrument which expressed a consideration of $100; and on the same day Brooks assigned and transferred the property to Winsor by an instrument expressing a consideration of $1. With the property thus acquired, the business of publishing a monthly magazine, called the University Magazine, was continued in the interest of Brooks, Eliot, and Winsor from June 24, 1890, until December 9, 1890, the date of the defendant's incorporation.    It is

claimed that between those dates, by reason of an increase in subscriptions and advertising contracts, the plant had greatly increased in value. As against this, however, we have the facts that it was run in July at a loss of $450; in August, of $150; in September, of about $125; that in October it about paid for itself, and in November there was a profit of about $150, and for the succeeding month, December, the profits were a little more. I do not think it necessary to go more into detail as to the value of the property, it being conclusively shown, to my mind, that it was not worth, on any basis of figuring, at the very outside, more than $10,000, which is a most liberal estimate. For this property, and without any evidence of prior negotiation, the company, at its first meeting, issued to Winsor its entire capital stock.

That this was not a purchase in good faith, that Winsor was not the real party in interest, and that the whole purpose was to turn the stock into the hands of the defendants Brooks and Eliot clearly appears from the fact that the certificate for the stock given on the purchase was immediately returned, and certificates issued either to Eliot or Brooks, or to persons whom they designated to receive the certificates. When money was needed, Brooks or Eliot obtained purchasers for the stock, and returned their certificates for the purpose of having deducted therefrom the amount of stock agreed to be issued to the persons purchasing. In some instances the money thus obtained from the sale of stock was deposited in the treasury of the company, and used for the purposes of the business. These facts appear from the way in which the stock was divided and held on the 24th of December, two weeks after the company was organized:

R. A. Zerega, certificate No. 2................................... 250 shares
Walter G. Eliot, certificates Nos. 3, 4, 5, 7, 9, 10, 11, 12.......... 1,250 shares
May Baker (a friend and client of Brooks), certificates Nos. 15,
    16, 17........................................................ 3,493 shares
Sundry small holders, certificates Nos. 6, 13, 14................ 7 shares
                                                                  ─────────────
                                                                  5,000 shares

It will be noticed that Winsor retained none of the stock, and it appears that all he got out of the transaction was $750, which came out of the stock sold to Zerega, who paid $1,000 for his holding, and that $250, the balance of this $1,000, went to Brooks as commission for effecting the sale.

As the law in regard to corporations like the defendant requires that stock, in order to be full paid, should be subscribed for at par or property of the full value contributed therefor, it is beyond question that the arrangement by which the stock was issued to Winsor did not make it full paid, the company receiving at the very outside, for its $50,000 in stock, not more than $10,000 in property. Were this an action, therefore, by a creditor to determine the liability of stockholders, the question upon this state of facts would be easy of solution. The action, however, is one brought by the plaintiff, on behalf of himself and all the stockholders of the corporation, for the purpose of compelling the return of all the stock

thus issued that was in excess of the value of the property acquired; the plaintiff acquiescing in the view that in addition thereto all the stock held by persons who purchased it for cash should be regarded as lawfully issued.    The question therefore presented is, can a stockholder, on behalf of himself and for the other stockholders, and practically for the benefit of the corporation, maintain such an action?    This question has been squarely presented in the case of Parsons v. Hayes, 14 Abb. N. C. 419, wherein the facts were in many respects similar to those here appearing.    There the plaintiff, suing on behalf of himself and the other stockholders in a mining corporation organized under the act of 1848, alleged that the defendants, who were the trustees of the corporation, issued its entire capital stock, of the par value of $2,000,000, to one C., as fully paid-up stock, in exchange for certain mining property which they knew was not worth more than $150,000;· that C. thereupon gave up over $200,000 worth of the stock, which was sold for the benefit of the corporation, and turned over $900,000 of stock to the defendants for their personal benefit; that all this was done in pursuance of previous agreements between C. and the trustees, and that the latter obtained large profits from the sale of stock that had been turned over to them. It was held in that case that inasmuch as the acts complained of were performed with the consent and participation of C., who was for the time being the holder of all the stock, the corporation had no cause of action or right to damages, and that the plaintiff, suing on its behalf, was not entitled to relief; that as C. was a party to the acts complained of, and so disqualified from suing, and as plaintiff's title to the stock held by him was derived from C., with notice, he could have no greater rights than his assignor.    There is one distinguishing feature between that case and the one at bar, in that it is here shown that the plaintiff had no notice, when he purchased his stock, of the illegal acts complained of, but that he bought his stock upon the representation that it was treasury stock, and that the moneys were to go into the treasury of the company, and that it was subsequent to his purchase that he became aware of the manner in which the capital stock had been issued, and of the way in which the individual defendants had secured their holdings.    The action, however, is in all other respects similar to Parsons v. Hayes, being brought by the plaintiff, not to recover damages by reason of any false representations,—not to repudiate the agreement under which he purchased his stock,—but on behalf of the corporation for the purpose of compelling a return to it of the shares of stock illegally and excessively issued, and to have determined who are the lawful holders of the stock of the corporation.    Unquestionably, it is such an action as the corporation itself should bring and maintain; and the reason for its not being so brought is furnished by the statement of the plaintiff that the defendants, who are in possession of the stock so illegally issued, are in control of the corporation as directors and trustees, and therefore would not bring an action as against themselves.    But assuming that there was no embarrassment by reason of the circumstance that the persons holding the illegal

stock were in control of the company, the question practically is, could the corporation itself maintain this action?

Upon the facts, the plaintiff fully sustains the allegations of his complaint by showing that under a colorable arrangement for the purchase of the property, insignificant as compared with the par value of the stock, the entire capital stock of the company was issued to them, and is now in their possession, or under their control. Upon the authorities, however, it would seem that a suit in equity, such as this, to compel them to return the stock, cannot be maintained. These authorities are collated in a footnote to the case referred to of Parsons v. Hayes, 14 Abb. N. C. 419; and in Skinner v. Smith, 134 N. Y. 240, 31 N. E. 911, it was held that stockholders of a private corporation may be denied equitable relief against acts of the corporation which do not affect the public, but only the interests of its stockholders, and which, although ultra vires, are not, per se, illegal or malum prohibitum, where the stockholders asking for relief have assented to those acts, or have acquiesced therein with full knowledge of the facts. It will be seen that, again, in this case, a distinction is taken between one who either knows or assents to or acquiesces in the transaction; and as in this case it is shown that the plaintiff neither knew, acquiesced in, nor assented to the acts complained of, it remains to be determined whether this circumstance changes the rule as laid down in the cases referred to. With respect to a transaction such as the overissue of stock, knowledge or want of knowledge would seemingly be of slight importance as affecting the right of a subsequent purchaser of the stock to the equitable relief such as is here asked. The authorities referred to proceed upon the reasoning that, as the corporation and all the stockholders assented to the illegal transaction when consummated, it suffered no damage and was not then injured by such illegal act, and that, no action then arising in its favor, this condition is not altered by the circumstance that the stockholders change and others take the place of those who originally held the stock. If this reasoning be sound,—that a corporation, by virtue of the assent of all the stockholders, had no grievance of which a court of equity would take cognizance,—it is difficult to see what difference it would make as to the right of such corporation to maintain an action subsequently based upon the fact that certain of the stock had been transferred to other holders.

Without assenting to the force of this logic, yet trying this case in the first instance, I am bound to follow these authorities. It does seem, however, to be rather anomalous that an illegal transaction such as is here clearly established leaves the corporation remediless when relief is asked in the interest of persons who, in good faith, for a full consideration, and without knowledge of or assenting to or acquiescence in the illegal act, become stockholders in the corporation. Upon the authorities, therefore, I am constrained to dismiss the complaint, but, under the circumstances, without costs.