CHARLES W. LUDLAM and Another, Suing for Themselves as Stockholders and for All Other Stockholders of RIVERHEAD BOND AND MORTGAGE CORPORATION, Similarly Situated, Appellants, *v.* RIVERHEAD BOND AND MORTGAGE CORPORATION and Others, Respondents.

Second Department, March 25, 1935.

*Joseph Steven Frank* [*George A. Gibson* and *Arthur Buxembaum* with him on the brief], for the appellants.

*John R. Vunk*, for the respondents.

DAVIS, J.   In this derivative action brought by stockholders of the defendant corporation, an accounting is sought from the individual defendants, as officers and directors, for losses arising from their alleged misconduct and the waste of corporate assets.   In particular the cause of action is based on a stock sales contract whereby the promoter, one Rutledge, was paid a commission of thirty per cent for the sale of the capital stock.   The complaint was dismissed on motion at the close of the plaintiffs' case on findings subsequently made.   The appeal is from the judgment entered on the findings.   That a suit in equity of this general character may be maintained is well settled and is not disputed here.   (*Hawes* v. *Oakland*, 104 U. S. 450; *Isaac* v. *Marcus*, 258 N. Y. 257, 264.)

The corporation was organized on December 29, 1925, in the State of Delaware at the instance of Rutledge and his attorney, Joseph.   The certificate of incorporation, the by-laws, the minutes of the first meeting of the incorporators and of the directors and stockholders were furnished ready-made by the United States Corporation Company in Delaware, which, it seems, undertakes the performance of such duties.   The capital stock originally consisted of 25,000 shares of no par value.   It was stated in the certificate that the corporation would commence business with ten shares. The United States Corporation Company furnished three dummies as incorporators, who were the subscribers respectively for four, three and three shares.   It does not appear that any shares were actually issued to them or that they or anybody in their behalf paid anything into the treasury.

On January 2, 1926, these three dummies held the first meeting of the incorporators at an office maintained by the United States Corporation Company at 150 Broadway, New York city. There they elected themselves directors for the ensuing year and adopted a resolution to issue 25,000 shares of stock without nominal or par value "from time to time for such consideration, as in the discretion of the directors may seem for the best interests of the corporation." They met again on January fourth as directors and elected one of their number as president and another as secretary and treasurer, and adopted certain formal resolutions. This was immediately followed by a special meeting of stockholders, of which these same three with their purported ten shares were all there were. The ten shares of stock or the subscriptions were then in form transferred, and apparently with no payment therefor, to three men named by Rutledge; the first three dummies resigned as officers and directors, and the other three, nominated by Rutledge, were elected in their stead. The functions of the first set of dummies thus ended and the duties were then assumed by the second set.

The new dummies proceeded with their duties with dispatch under the guidance of Rutledge and Joseph. On January fifth they met as directors, adopted formal resolutions, and had presented to them "the draft of an agreement between F. S. Rutledge and this company (a copy of which is attached hereto), for certain services rendered and making provision for financing of this company." With great show of formality and many recitals a resolution was adopted, "after due consideration and discussion, that it is necessary and advantageous and for the best interest of this company that it acquire the services offered, * * * that the said draft * * * be approved, and that this company acquire the services therein described on the terms therein set forth, and that the President be and he hereby is authorized to execute the engrossment of said draft in the name and behalf of the company." The recital that the ready-made resolution was adopted by these dummy directors " after due consideration and discussion " is farcical, but highly illustrative of the manner in which the rights of future stockholders were to be affected.

In brief, this agreement appointed Rutledge as the sole representative for the sale of the entire capital stock at a commission of thirty per cent of the selling price, " payable out of the first payments received on each subscription and the Agent may sell stock with an initial down payment of forty (40%) per cent of the sales price, and the balance in twelve, or less, monthly payments." There was established in the agreement a schedule of prices for which

the stock was to be sold, beginning with 7,000 shares at five dollars a share and continuing on an ascending scale in different numbers of shares until the price reached fifty dollars per share. There was no classification of stock in the certificate of incorporation, and the varying scale was apparently to permit certain representative men of standing in Suffolk county to obtain their stock secretly at a low price, while others who might later be induced to subscribe would be required to pay a higher price.

There were further provisions in the contract that if at any time the capital of the corporation was increased, Rutledge or his assignees must be given opportunity to sell the additional shares " on the same or more favorable terms as it is offered to any other person. The refusal to grant the agent such sale shall entitle the agent to commissions of thirty (30%) per cent on such increased capital. The word ' capital ' as used in this paragraph shall include issues of bonds, long term notes or other securities except ordinary commercial paper discounted with banks." Therefore, the agent had a continuing contract with the corporation to receive thirty per cent commission on the sales of the stock or any other securities that might be offered for sale.

The agent, on his part, undertook to use his best efforts in procuring the sale of stock as rapidly as possible, and to pay all expenses in connection with the sale; but the corporation was to provide the agent with literature, prospectus and printed matter in such reasonable quantities and in such form as might be required by him.

Evidently sales started somewhat briskly, for on January sixteenth these dummy directors held another meeting and resolved that it was advisable to increase the capital stock from 25,000 to 50,000 shares. This was done by executing an amended certificate the same day by the officers of the corporation. There was a change in the directors following this meeting — two other dummies being substituted in the place of two who resigned. On January eighteenth the directors made a new contract for the sale of the 50,000 shares on the same terms as the one previously made in respect to 25,000 shares, except that there was some regrading of the scale of prices of stock, starting with a minimum of 10,000 shares at five dollars a share, with the price stepping up with designated numbers of shares until the last thousand were to be sold at thirty-five dollars per share.

The next meeting of the directors was held on January thirtieth. Prior to that date, stock had been sold to some well-known men in Suffolk county; one of the dummies resigned; the board of directors was increased; and three new stockholders were elected directors.

From this time on, the dummies took no part in the affairs of the company and other directors were elected, so that by February 11, 1926, the corporation appears to have been in complete control of local residents of Suffolk county.

In the absence of any testimony giving explanation on the part of these new men who had been elected directors and officers, it is fair to assume that they subscribed for their stock at the lowest price. That is the ordinary practice of organizing corporations of this kind by a promoter. Certain prominent men are taken in " on the ground floor " for the purpose of using their names in the sales of stock, at a higher price, to their neighbors and the residents of the community. It is an appeal to the cupidity and vanity of men that rarely fails. The testimony of one of plaintiffs' expert witnesses confirms this when he says: " The only thing that we have to offer to inspire confidence in the prospective stockholder's mind is the standing and reputation of the men who are going to handle their funds. If they are well known locally, if their reputation is good, and they have proven their ability to handle that type of business, sale responsibility is considerably lower. We are then enabled to take the contract at a lower figure. If the board of directors is composed of John Jones and Jim Smith, unknown, and with no established reputation, then it comes in the line of a promotion, and the contract rate is always higher because the responsibility is greater."

Further " window dressing " was given to the enterprise by the appointment on April twenty-second of a number of persons to an "Advisory Board." It will be interesting to learn the price these men paid for their stock.

Evidently sales went well after advertising in local papers, giving the names of these eminently respectable men as officers and directors of the corporation. As one of the witnesses testified, Long Island was at that time " a fertile field " for such exploitations. By May thirteenth, 5,000 shares had been sold at five dollars per share; 16,850 at ten dollars per share; and lesser numbers sold in the higher brackets, aggregating $609,397.50. By May twenty-fourth, practically all of the shares were sold at a total subscription price of $718,057.50. There were some cancellations. The type of persons who were buying the stock on installment payments is indicated by the fact that cancellations were permitted to some who had paid in as little as twenty-eight and thirty dollars on their subscriptions. The aggregate sum actually received from the sale of stock during the first year was $636,156.50; and during that period the corporation paid to Rutledge as commissions $206,048.25. It is the payment of this large sum that the plaintiffs

attack as arising from the misconduct of the officers and directors and constituting waste of the corporate assets.

The plaintiffs encountered difficulties in making proof on the trial under the strict limitations to which they were held by the trial justice. They were obliged to call hostile witnesses to establish the facts surrounding the incorporation of defendant and the making and performance of the sales contract. On cross-examination of these witnesses defendants' counsel was permitted to produce evidence to the effect that a charge of thirty per cent was a reasonable one in that locality. The opinions of these witnesses, Rutledge and Joseph, were based on the fact that two other corporations organized by them to operate in Suffolk county had made similar contracts for the sale of their stock. This evidence was of little, if any, value in fixing a reasonable commission. It was not strictly cross-examination of the witnesses on testimony developed on direct examination and properly could have been excluded until the defense was reached. It resulted in surprise to the attorney for plaintiffs — particularly in view of the narrow rule adopted by the trial justice that proof of custom and of reasonable commissions should be in the main limited to this type of corporations organized and operating in Suffolk county. The attorney asked for a short continuance to produce witnesses to meet the limitation, but this was refused — the trial justice frankly stating that if such testimony were produced it would not change his view. We think the continuance should have been granted and that the further evidence should have been taken, if for no other reason than to furnish a better record for complete review. Likewise, for the same reason, the explanation of their acts by the defendant directors should have been heard before reaching a conclusion on the merits.

It is familiar law that officers and directors of a corporation stand in a fiduciary relation to the stockholders and owe to the latter the duty of wise, honest and faithful performance of their duties in respect to the property of the corporation. If they fail in that duty, the courts hold them accountable to stockholders who are aggrieved. (*Godley* v. *Crandall & Godley Co.*, 212 N. Y. 121; *Pollitz* v. *Wabash R. R. Co.*, 207 id. 113; *Bosworth* v. *Allen*, 168 id. 157; *Sage* v. *Culver*, 147 id. 241.)

The plaintiffs produced testimony by experts that the ordinary and reasonable commissions for selling stock of that or a similar kind on Long Island varied from seven and a half per cent to fifteen per cent, and that thirty per cent was an unreasonable charge. Opposed to it was only the testimony of Rutledge and Joseph, already stated. While the value to be fixed on the sale of stock as well as on the sale of property is ordinarily held to be a matter of

judgment and discretion vested in the directors, that rule does not furnish a license to them to make or to perform contracts so unreasonable in their character that the assets of the corporation will become wasted.

As the record stands, taking into consideration the manner of organization, the method of making the contract, and the selling of stock at graded prices, it seems that as a question of law the agreement is so excessive, unreasonable and unconscionable that it is void, unless the directors make some adequate explanation of their conduct and show that the agreement is not unreasonable and the amounts paid are not excessive — then it may become a question of fact. Further, it is evident that this was a devious method of evading the prohibition against the payment of promoters' profits. Neither the stock nor the property of a corporation may be issued or paid out to a promoter for his services in organizing the corporation. (Stock Corp. Law, § 69; *Herbert* v. *Duryea*, 34 App. Div. 478; affd., 164 N. Y. 596; *Berger* v. *National Architects' Bronze Co.*, 173 App. Div. 680; *Osann* v. *Jones*, 209 id. 9.)

The facts above recited are chiefly to be found in the records of the corporation. How much did the defendant directors know about fair and reasonable commissions? How far did they investigate before blindly accepting the contract made with their dummy predecessors and paying nearly one-third of the total assets of the company for services that were rendered in less than a year? They owe to the stockholders some explanation of their conduct in thus depleting the property of the corporation. (*Rogers* v. *Hill*, 289 U. S. 582, 591.) If their acts constituted something more than an error of judgment, then liability follows. If there was a personal interest of the directors in increasing the amount of capital of the corporation by selling stock to others at a price much in excess of what they, themselves, had paid, then the duty of explanation becomes greater. (*Sage* v. *Culver*, *supra*, p. 247.)

Authorities are lacking on the precise question as to what constitutes an unreasonable or excessive commission for the sale of capital stock; but the absence of precedent does not restrict a court of equity in giving relief where it is evident that a remedy should be furnished. (*Rice* v. *Van Vranken*, 132 Misc. 82, 86; affd., 225 App. Div. 179; affd., 255 N. Y. 541; *Brown* v. *DeYoung*, 167 Ill. 549, 558; 47 N. E. 863.) We think it must be determined on the general principle, as already stated, that directors act in a fiduciary capacity and are not entitled to pay unreasonable commissions and thereby waste the corporate assets. We must take into consideration the fact that these directors apparently got their stock at a low price, and the principal part of the commissions was paid out of

the money of the stockholders who purchased at a higher price, probably without knowledge of the fact that the officers and directors on whom they relied had obtained their stock on more favorable terms. Unless some explanation is forthcoming, this on its face depleted the assets of the corporation and was unfair and unjust to a great majority of the stockholders. If the contract was unreasonable and unconscionable, the individual defendants either should not have identified themselves with the corporation at all, or, when they discovered the facts, which were all contained in the minute book, should have proceeded at once to abrogate and cancel the contract. Instead of taking such action, they approved the contract by paying the commissions to Rutledge. " No custom or practice can make a directorship a mere position of honor void of responsibility, or cause a name to become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection." (*Kavanaugh* v. *Commonwealth Trust Co.*, 223 N. Y. 103, 106.)

The rule does not greatly differ from that applied where excessive and unreasonable salaries and bonuses are paid to officers and directors. (*Godley* v. *Crandall & Godley Co., supra; Rogers* v. *Hill, supra; Seitz* v. *Union Brass & Metal Mfg. Co.*, 152 Minn. 460, 464; 189 N. W. 586; *Matthews* v. *Headley Chocolate Co.*, 130 Md. 523, 536 *et seq.*; 100 A. 645.) The question arises when the exercise of sound judgment ceases and the lack of good faith begins. It may be added that, in recent years, courts have in general held directors of corporations to a higher standard of duty than was formerly the rule. A stricter rule has become necessary by a growing inclination on the part of officers and directors of large corporations to consider their personal interests and profits to the exclusion of the rights and interests of a large and uninformed body of stockholders. Whether or not a court will act must be determined by the facts developed on the trial, with the complaining stockholders carrying the burden of proof.

Whether or not the commissions were unreasonable or excessive under the circumstances must, after the defendants have had an opportunity to explain, constitute a question of fact. (*Fire Alarm Co.* v. *Watchman Clock Co.*, 166 Mich. 618; 132 N. W. 502.) (See, also, 1 Cook Corp. [8th ed.] § 42, pp. 195, 196.) Likewise, the commission that is reasonable must be determined on a trial.

Defendant Bagshaw became a director after the commissions had been paid. It is conceded that no liability exists against him, and as to him the complaint was properly dismissed.

The judgment should be reversed on the law and the facts, except as to defendant Bagshaw, and a new trial granted, with costs to

appellants to abide the event. For the purpose of granting a new trial, all findings of fact should be reversed except those applicable to defendant Bagshaw; and as to him the judgment should be affirmed, without costs.

LAZANSKY, P. J., HAGARTY and TOMPKINS, JJ., concur; SCUDDER, J., not voting.

Judgment reversed on the law and the facts, except as to defendant Bagshaw, and a new trial granted, with costs to appellants to abide the event. Findings of fact reversed except those applicable to defendant Bagshaw, as to whom the judgment is unanimously affirmed, without costs.