Kimmel Sales Corporation, by Frederick C. Kimmel, a Stockholder Thereof, Plaintiff, *v.* Roy A. Lauster and Others, Defendants.

Supreme Court, Monroe County, May 6, 1938.

*Charles Fiandaca,* for the plaintiff.

*Abbott, Rippey & Hutchens,* for the defendants.

Van Voorhis, J. This action is brought by Frederick C. Kimmel, as a stockholder on behalf of Kimmel Sales Corporation, for the cancellation and surrender of certificates representing shares of stock claimed to have been issued to defendants Roy A. Lauster, Charles C. Peck and Harold G. Hutchens for insufficient consideration and a determination that said stock is void in their hands

under section 69 of the Stock Corporation Law. Further relief incidental thereto is prayed for which will be referred to hereafter.

It is held that the shares issued to Hutchens were for legal services rendered to the corporation, and are not subject to attack. On the other hand, the shares of Lauster and Peck were issued partially in consideration of promoters' services rendered prior to the formation of the corporation. This appears from the resolution of the board of directors purporting to authorize the issuance of their shares to these defendants and does not constitute compliance with section 69 of the Stock Corporation Law. (*Herbert* v. *Duryea*, 34 App. Div. 478; affd., 164 N. Y. 596; *Ludlam* v. *Riverhead Bond & Mtge. Corp.*, 244 App. Div. 113; *Dancey* v. *Brieger Press, Inc.*, 235 id. 861.)

The questions remain whether Frederick C. Kimmel, at whose instance this action is brought, is estopped from contesting the validity of the shares now held by the said defendants, and whether the issuance thereof has been ratified by the stockholders. For those reasons the court is of opinion that plaintiff cannot succeed. The facts establishing estoppel and ratification are these: The 100 authorized shares of capital stock of the corporation were distributed soon after its organization in the form of fully paid and non-assessable stock as follows: Frederick C. Kimmel, $33\frac{1}{3}$ shares; Roy A. Lauster, 30 shares; Charles G. Peck, 30 shares; Harold G. Hutchens, $6\frac{2}{3}$ shares. Certificates in these denominations were issued to these men pursuant to resolutions for which Frederick C. Kimmel voted as a director. Mr. Kimmel knew at the time that certificates were issued to these persons in these amounts. After the corporation had done business for approximately two years, Kimmel told Lauster and Peck that they held too much stock. At that time the patent on which the corporation was founded and which had been assigned to it by Kimmel in consideration for the stock issued to him was about to revert to Kimmel by reason of the circumstance that the corporation had failed to sell the minimum number of patented articles stipulated by the assignment. New arrangements were thereupon made between the parties pursuant to which Lauster and Peck surrendered seven shares apiece of their stock at Kimmel's behest, in consideration whereof Kimmel granted a license to the corporation to use the patent for at least three years upon payment to him of a royalty. The shares so surrendered by Lauster and Peck were not canceled as void, nor did they go into the treasury of the corporation. All except one and one-third shares were transferred as fully-paid stock to Kimmel's brother, Joseph H. Kimmel, together with certain of Kimmel's shares which he also caused to be trans-

ferred to his brother at the same time. Lauster and Peck were not asked by Kimmel to give up all of their stock on the theory that it was void. They were asked to transfer part of it on the basis that it was outstanding and fully paid for. If the Lauster and Peck stock had been dealt with upon the theory that it was invalid, Joseph H. Kimmel could not have acquired his stock as the result of a transfer from Lauster and Peck. It would have come to him from the unissued stock of the corporation upon the theory that it had never before been outstanding. In the latter event there would have been a resolution of the board of directors authorizing the issue to Joseph H. Kimmel and fixing the consideration to be received by the corporation therefor. No such resolution appears upon the minute book, nor does the stock book show that anything was paid to the corporation for the issuance of these shares to Joseph H. Kimmel. On the contrary, it is entered that they were transferred to him by Charles Peck and Roy Lauster. It is true that as part of this transaction the corporation received a license to operate under Kimmel's patent. This was part of the bargain between Kimmel, Lauster and Peck, and was the consideration for the surrender of seven shares by each of the latter two men. It was not payment to the corporation for unissued shares awarded to Joseph H. Kimmel. Such an inference is rebutted by the testimony of Mr. Kimmel as well as the books of the corporation. Said one and one-third shares were transferred by common agreement to Hutchens. These matters were consented to and done voluntarily by all of the parties, who were the holders of all outstanding shares in the corporation. Thereafter the business prospered. No serious friction developed until a year and a half later. What caused the trouble is not clear. If Kimmel made what time has shown to be an improvident bargain with Lauster and Peck, it is beyond the powers of the court to correct it in this action. The record discloses merely informalities in their original dealings which have been cured by their affirmative acts and more than three years' acquiescence by all the stockholders with knowledge of the facts. Such informalities appear to have resulted from failure at times to observe the distinctions involved between dealings under the form of a corporation and between the stockholders as individuals, rather than from any substantial wrongdoing. They entered business together about three months before the certificate of incorporation was filed. Kimmel was an inventor and manufacturer; Lauster and Peck were interested in sales promotion of one of Kimmel's products known as an electric broilrite, which was covered by the patent hereinbefore mentioned. Kimmel knew from the beginning that neither of them had much capital.

They proposed to form a sales corporation, afterward organized under the name of Kimmel Sales Corporation, in which all three should be interested, and which should handle sales of the electric broilrite. Only a small part of their transactions and agreements were reduced to writing, but it is clear that they agreed at the outset that Lauster and Peck would contribute $200 capital apiece to the new corporation which the two of them were to control, and that they would in addition lend money to Kimmel personally to enable him to manufacture broilrites which the new corporation might sell. Lauster and Peck commenced immediately to supply their capital and lend the necessary funds for manufacture. They loaned to Kimmel prior to incorporation $324.64 in the case of Lauster, and $225.65 in the case of Peck. These funds were not recouped by retaining the proceeds of sales of broilrites. Such funds, including selling profits, which went through Lauster's or Peck's hands were paid by them to Kimmel or to the corporation in addition to the loans and capital furnished by them. Otherwise the business could not have continued in operation. When the sales corporation was organized Kimmel, rather than the corporation, had been supplied with all but fifty dollars of Peck's capital and all but $160.82 of Lausser's. Then the corporate books were set up. Lauster and Peck paid the balance of their capital contribution to the corporation and were credited on the corporate books with the capital which they had already paid to Kimmel, and they proceeded to execute and deliver to themselves notes of the corporation in the amounts which they had previously loaned to Kimmel. These loans were paid back in numerous installments by the corporation extending over the period of the ensuing year. The thing which bulked larger than anything else in the estimation of Kimmel as well as of Lauster and Peck was their personal services. He quickly receded from his original demand that they obtain $5,000 capital, which was impossible and which they never agreed to do. Both were young men without substantial financial resources but who were evidently ambitious to devote their energies to the sales development of the electric broilrite which had not theretofore been particularly successful. It is evident that they were not satisfied to devote their time and energies and such money as they were able to command for the small wages which were all they could for some time expect, without at the same time owning a stake in the business represented by stock. Kimmel undoubtedly knew that they could not otherwise be induced to remain with the business. This appears to have been the thought which motivated the wording of the directors' resolution authorizing the issuance of their stock, in referring to their services in promoting

the organization of the corporation. The important consideration in the minds of all the parties was not how much the corporation received for its stock but rather how its stock should be distributed, and that it should be distributed in such proportions as to keep everybody satisfied. The stock certificates themselves recite in heavy type that it is fully paid and non-assessable. Kimmel must have known this from reading his own certificates. There was no thought on his part that the stock was void in the hands of Lauster and Peck when he asked them to surrender some of it in order that it might be transferred to his brother. At this time, after the company had been in business for two years, it can scarcely be said that Kimmel was ignorant of what the corporation had received from Lauster and Peck. During the fiscal year ending October 31, 1937, the company sold five times the number of broilrites sold during the preceding year. If a claim was to be made that Lauster and Peck were not stockholders, Mr. Kimmel should have told them so in the beginning and not lured them on to promote the business of selling his broilrites in the belief that they had an interest in the company only to be met at the end of four years with the claim that their belief was illusory and their stock interest a nullity. Inasmuch as cancellation of defendant's stock is not ordered, the relief demanded by plaintiff upon the theory that defendants managed the corporation without right as a result of voting shares of stock void in their hands need not be considered. This applies principally to moneys paid to defendants for personal services, which appear to have been reasonable in amount and consented to or acquiesced in by Kimmel as well. These moneys were voted to defendants for services rendered and not as mere incidents of their offices. (*Godley* v. *Crandall & Godley Co.*, 212 N. Y. 121, 131, 132.)

The recovery claimed by plaintiff of moneys paid to Lauster and Peck out of the treasury of the corporation upon the corporate notes held by them to repay their loans to Kimmel remains to be considered. The corporation was technically not liable to repay these moneys which had been loaned by Lauster and Peck to Kimmel. There appears to have been no concealment of the fact that these loans were being repaid out of corporate funds which took place over a long period of time. Numerous installment payments to Lauster and Peck were entered upon the books. Kimmel must have known of the payments of these moneys long before July, 1937, which is when he first objected to them. Inasmuch as they represented personal liabilities of his own and were acquiesced in by all of the stockholders of the corporation and no rights of creditors are involved, they should not now be disturbed.

These are not the moneys which it has been found that Lauster and Peck supplied for capital. But it may be noted that Kimmel's contention that all their money went in as capital is scarcely consistent with his position that they never became stockholders.

Such a determination of the questions involved is in accordance with well-established principles of law. The consequences are different where rights of creditors or of the public are involved. Where the controversy is solely between the corporation and its stockholders, it is held that the stockholders unanimously can do what they will with the corporate assets which are their own. (*Blum* v. *Whitney*, 185 N. Y. 232; *Gilbert Paper Co.* v. *Prankard*, 204 App. Div. 83, 88; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159; *Markson* v. *Markson's Furniture Stores, Inc.*, 267 id. 137.)

It is argued on behalf of plaintiff inasmuch as the Lauster and Peck stock was issued in violation of section 69 of the Stock Corporation Law, that it became void in their hands, and consequently incapable of ratification by stockholders. That is not the effect of this section, for " nothing in the act contained declares that the stock itself is void where it is issued without such consideration." (*Ersfeld* v. *Exner*, 128 App. Div. 135, 136.) Even where creditors are involved the consequences are of another nature. Not only does the section fail to state that such stock is void, but section 70 shows the contrary. The latter section states that " every holder of shares of stock not fully paid shall be personally liable to the creditors of the corporation, to an amount equal to the amount unpaid on the shares held by him for debts of the corporation contracted while such shares were held by him." It necessarily follows that the issuance of stock without consideration does not *ipso facto* invalidate the shares. Otherwise there could be no holders of it. No one can hold something which is a nullity. If such shares were void, the statute in referring to " every holder of shares of stock not fully paid " would be a contradiction in terms. Whether such a transaction is voidable at the instance of stockholders in the absence of ratification is another question.

It is said that stock issued in violation of section 69 is prohibited by law, and, therefore, not within the principles of the leading case of *Kent* v. *Quicksilver Mining Co.* (78 N. Y. 159). Such an interpretation misconstrues the basic distinction there drawn. Where the public is concerned, *e. g.*, in the violation of a statute limiting the powers of a public service corporation (*Berkey* v. *Third Avenue R. Co.*, 244 N. Y. 84, 90, 92), or where creditors' interests are adversely affected, there can be no waiver or estoppel as a result of action or inaction by the stockholders, but where only the interests of the stockholders themselves are at stake, the

contrary holds good. Some statutes are for the protection of stockholders, whereas others are for the protection of creditors or of the public. The same statute under some circumstances protects stockholders alone and under other circumstances protects creditors. No principle of public policy prevents a stockholder from waiving the benefit of a statute enacted for his own protection. He has the power to surrender voluntarily his own rights whether they are conferred on him by statute or otherwise, provided that he does not destroy rights of others under the guise of parting with his own. Where creditors are involved, the remedy is provided by section 70 and is not to cancel the stock but to hold the stockholder liable to the extent of the inadequacy of the consideration for which it was issued. On the other hand, stockholders whose equity in the assets of the corporation has been diluted by the issuance of shares without lawful consideration, have been granted relief in actions for cancellation upon the theory that the stock is voidable at their election. (*American Macaroni Corp.* v. *Saumer*, 174 N. Y. Supp. 183. See, also, *Pollitz* v. *Gould*, 202 N. Y. 11.) No decision is rendered here concerning whether the defendants Lauster and Peck would be liable to creditors of the corporation. The point is that where the interests of creditors are present, cancellation is not the remedy, and that where cancellation is granted at the instance of stockholders it is to protect stockholders' rights which they can waive. Clearly it is not the mere fact of a statutory violation which determines whether the doctrines of waiver and estoppel by stockholders can be applied, but rather it is whether in a particular case the statute inures to the benefit of stockholders or creditors. In *McCarty* v. *Nostrand Lumber Co., Inc., No. 2* (232 App. Div. 63, 66) it was held that stockholders were competent to waive violation of section 15 of the Stock Corporation Law prohibiting the transfer of the property of a corporation to any of its stockholders for other than the full value paid in cash. No rights of creditors were involved. In *Kent* v. *Quicksilver Mining Co.* (*supra*) the court intimated at the bottom of page 185 that a departure from statutory direction "which is to be considered merely a breach of trust to be restrained by a stockholder" is capable of being waived by the stockholder. In *Parsons* v. *Hayes* (14 Abb. N. C. 419), followed in *Blum* v. *Whitney* (185 N. Y. 232), *Ward* v. *Smith* (95 App. Div. 432, 436) and *Miller* v. *University Magazine Co.* (10 Misc. 311, 316), the General Term had squarely presented before it the question whether there could be ratification of the issuance of stock for inadequate consideration in the face of a statute similar to the present section 69 of the Stock Corporation Law, and held that the corporation could not bring

an action for the benefit of a stockholder who had taken part in the transaction and could not claim as damage to its interest what would be damage to the beneficial interest of the stockholders when the latter had consented. *Kent* v. *Quicksilver Mining Co. (supra)* was cited as authority for this ruling. After citing it the court stated (14 Abb. N. C., at pp. 432, 433): " It is not necessary to give the reasoning of these cases; they are applicable here. It is supposed that in the last case there is a difference, in that acquiescence of shareholders was held to estop them in favor of innocent third parties. But it must be considered that after the power to ratify or acquiesce is held to exist, the same principle would act in favor of third parties although not innocent, against whom damages for the act ratified were claimed."

The rule in other States is said to be that such transactions can be ratified, except in a few where the statute declares that such stock shall be absolutely void. (14 C. J. p. 477, § 696.) *First Avenue Land Company* v. *Parker* (111 Wis. 1; 86 N. W. 604) illustrates the exception.

In *Holbrook* v. *New Jersey Zinc Co.* (57 N. Y. 616) a corporation was held to be estopped to question its certificate that its stock was fully paid.

In *Gray* v. *Aspironal Laboratories* (24 F. [2d] 97) a stockholder was held estopped to maintain a suit to cancel an unauthorized gift of stock by the directors to the president of the corporation by the action of a proxy in voting his stock to ratify the gift.

A similar holding is *Granite Brick Co.* v. *Titus* (126 Fed. 557). In the latter case, in the face of provisions in the Constitution and Civil Code of South Carolina drawn in virtually the same language as section 69 of our Stock Corporation Law, it was held that though the stock had not been fully paid in, yet, all of the shareholders of the corporation having agreed to the transaction, they were estopped from questioning the issue. The court quoted the following statement from the opinion in *Dickerman* v. *Northern Trust Co.* (176 U. S. 181, 202): " ' The very authorities which hold that the declaration that the stock is fully paid and unassessable is not binding upon creditors, also hold that the corporation cannot repudiate it and proceed to collect either from the person receiving the stock or his transferee the unpaid part of the par value * * * There is no doubt that, if this were a suit by creditors to enforce payment of the unpaid portion of the stock subscription, the fact that the stock certificates declared that they were fully paid and unassessable would be no defense; but it is a suit of stockholders in the right of the corporation, and as between the corporation and its stockholders the declaration that the shares are fully paid

up and unassessable is a valid one.' *Scovill* v. *Thayer*, 105 U. S. 143; 26 L. Ed. 968; Cook on Corp. 38.'' (See, also, *Drake* v. *New York Suburban Water Co.*, 26 App. Div. 499; *East Lake Lumber Co.* v. *Van Gorder*, 105 Misc. 704, 715; *Pocantico Water Works* v. *Low*, 20 id. 484.)

'' An issue of stock by a corporation as a bonus or gratuity, at less than its par value, or on payment therefor in property at an overvaluation, is binding  \*  \*  \*  by estoppel, even when in violation of a constitutional or statutory provision, upon participating, consenting or acquiescing stockholders and their transferees, so that they cannot sue to set the transaction aside.'' (14 C. J. p. 452, § 613; Id. p. 449, § 609.)

The resemblance between the case at bar and *Palmer* v. *Sheftel* (183 App. Div. 77, judgment for plaintiff after new trial, 194 id. 682; affd., 236 N. Y. 511) is superficial. That action was brought by a trustee in bankruptcy of a corporation against certain stockholders to recover for the benefit of creditors the difference between the par value of their shares and what the corporation had actually received. No claim was made for cancellation of the stock as void. The principal consideration alleged for its issuance was an agreement to perform services in the future, and the action was commenced after the stipulated services had been performed. It was contended that by accepting these services the corporation became estopped, but the court held that the services involved were of such nature that it was beyond the powers of the corporation to contract for them regardless of when they were to be performed, and that, consequently, the employment contract was invalid, with the result that the consideration for the issuance of the stock failed *pro tanto* and that the offending stockholders were obliged to pay the deficiency between the valid consideration and the par value. No questions of estoppel or ratification on the part of the other stockholders were involved.

The complaint is dismissed, with costs.