WILLIAM R. FRASIER AND BARBARA L. FRASIER, HUSBAND AND WIFE, APPELLANTS, V. TRANS-WESTERN LAND CORPORATION, A CORPORATION, G. FREDRIC WOOD, AND TED DEYLE AND PLATTE VALLEY LAND COMPANY, A CORPORATION, APPELLEES.

316 N.W.2d 612

Filed February 26, 1982. No. 44217.

Jim Zimmerman of Atkins, Ferguson, Hahn, Zimmerman & Carney for appellants.

Robert W. Mullin of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke for appellees.

Submitted without oral argument. KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

KRIVOSHA, C.J.

The instant appeal presents to the court what appears to be a matter of first impression in this jurisdiction. It concerns a dispute between stockholders as to whether certain stock of Trans-Western Land Corporation (Trans-Western), held in the name of William R. Frasier and Barbara L. Frasier (Frasiers), was issued without consideration and therefore void. The result of that fact would be to find that the Frasiers were not stockholders of Trans-Western on August 17, 1979, the relevant date in question, and not entitled to notice of the anticipated sale of substantially all of the assets of Trans-Western, pursuant to the provisions of Neb. Rev. Stat. § 21-2078 (Reissue 1977). The trial court found that the stock issued to the Frasiers was void because the Frasiers had not paid an equivalent in money or labor done or property delivered to Trans-Western, and that Trans-Western was not required to give notice to the Frasiers. We reverse.

The facts surrounding the instant case are somewhat complicated, though not substantially in dispute. William Frasier, a real estate broker, builder, and developer, and G. Fredric Wood (Wood), an acquaintance of Frasier for some 10 years earlier, were both living in Colorado early in 1977. Wood contacted Frasier and asked him if he was interested in returning to Nebraska. They discussed the possibility of returning to Alliance, Nebraska, and starting a land development, construction, and real estate company. Wood advised Frasier at that time that Wood's uncle, Ted Deyle (Deyle), would fund them if they returned to Nebraska and started such a project. As a result of that conversation, Wood and Frasier did return to Alliance in March

of 1977 and subsequently proceeded to look for land which could be developed. In November of 1977 Frasier and Wood located some ground which they purchased in the name of Kincaider Companies, Inc. (Kincaider), a Nebraska corporation consisting of Frasier and Wood. Each initially paid into the corporation $1,000 and later paid an additional $500 apiece when they purchased the Peterson Subdivision. The land purchased was generally described as Peterson Subdivision to the City of Alliance, Box Butte County, Nebraska, and was purchased for a total purchase price of $45,000.

The purchase agreement covering the Peterson property required a payment of $12,000 to be made by Kincaider at the time of closing. Kincaider did not have sufficient funds to make the payment, and Wood and Frasier borrowed the money individually from Deyle and personally executed a promissory note for the $12,000. Wood and Frasier then proceeded to develop the land, including revising the plat and redividing certain of the lots.

On December 23, 1977, Frasier and Wood signed a memorandum of understanding which was then sent to Deyle. The agreement provided in part: "In consideration and receipt of $12,000.00 from Ted Deyle, dba Deyle Construction, Inc., (hereinafter called Deyle), the following is stipulated as a letter of intent and agreement.

. . . .

"4. Deyle, Wood and Frasier shall form immediately and as soon as possible a Nebraska Corporation to be known as DeKin, Incorporated, with each party having a fully paid and non-assessable 33 1/3rd% interest in said corporation.

. . . .

"6. Frasier and Wood shall handle and be responsible for all zoning, platting and duties relative to development of Peterson Subdivision in a manner in the best interest of DeKin, Incorporated.

"7. Deyle shall provide all funds necessary to facilitate development of said subdivision as deemed necessary by the parties hereto, interest rate to be determined.

"8. DeKin, Incorporated, shall, through the efforts of Wood and Frasier, sell said subdivision in parts or parcels, in a manner agreeable to all parties hereto, with the intent of profit to Dekin, Incorporated.

"9. Until such time as DeKin Incorporated is incorporated and title conveyed, this agreement shall be construed as each party hereto having a 33 1/3rd percent interest in Petereson [sic] Subdivision, subject to encumbrances referenced and/or of record. ie: Deyle 33 1/3rd% ownership  Wood 33 1/3rd ownership Frasier 33 1/3rd% ownership. These interests shall inure to the benefit of their heirs."

Trans-Western is in fact the corporation referred to as DeKin in the agreement of December 23, 1977. Trans-Western was incorporated on January 30, 1978, and a certificate of incorporation was issued by the Secretary of State on February 17, 1978, the stock certificates having been dated February 12, 1978, and issued to the three stockholders. The par value of each share of stock was established in the amount of $.50 and each shareholder received 5,000 shares of common stock.

In May of 1978 Wood approached Frasier and advised him that he thought they had to put $2,500 in cash into the corporation. Frasier refused to do so, saying that he felt that the agreement clearly specified it was up to Deyle to fund everything necessary for the corporation and that Frasier and Wood were to do work for their shares. At Wood's suggestion, however, they wrote checks to the corporation in the amount of $2,500 and then had the corporation write checks back to them in a similar amount. They sought to satisfy Deyle's contribution by executing a mortgage in the amount of $50,000, though they agreed the value of the Peterson land was then only $47,500. They concluded that the additional $2,500

represented Deyle's contribution to the corporation. Upon receipt of the mortgage in the amount of $50,000, Deyle accepted the stock and gave the corporation the necessary money to pay off its obligations in connection with the purchase of the Peterson property, as well as canceling the $12,000 note. Frasier continued to work on developing the property, including seeking a change in zoning.

In June of 1978 Wood received a letter from Deyle, advising him that Deyle did not want the $2,500 to be reflected in the mortgage, and, instead, issued a receipt for $2,500 which his letter said "was deducted from proceeds of note dated 6-1-78 for stock to coincide with repayment of like amount for stock to you & Bill." There is no evidence that Frasier knew of the letter at this time.

In February of 1979 Frasier received a letter from an attorney representing Trans-Western suggesting that the manner in which the payment for the stock had been conducted was not proper and requesting that he pay $2,500 to the corporation. Wood received a similar letter. Subsequent to receiving the letter, Wood actually paid $2,500 into the corporation, though Frasier continued to deny that he was obligated in any respect to pay any money for his stock, maintaining that he was to receive his shares in return for work. Some 12 months had elapsed between the time the stock was issued and Frasier received the letter demanding the payment.

Frasier ultimately resigned as an officer and director of Trans-Western, though he remained what he thought was a stockholder. Thereafter, on March 19, 1979, a meeting was held between Wood and Deyle as directors and officers of Trans-Western. At that meeting the Frasiers' shares of stock were canceled and treated as redeemed and as treasury stock. The record fails to disclose that information of that fact was ever conveyed to Frasier.

On August 17, 1979, the Peterson Subdivision land

was conveyed by Trans-Western to Deyle for the sum of $57,000. As part payment the note and mortgage for $50,000 held by Deyle was canceled. Frasier received no notice of the corporation's intent to convey all of its assets to Deyle. Thereafter, on September 28, 1979, a lease agreement was entered into by and between Wood and his wife, Deyle and his wife, and a third party, as owners of the Peterson Subdivision tract, with the Alliance Day Care Center, Inc., as lessee. The record does not disclose how either Wood or the third party acquired their interest in the land. The lease agreement provided that a building was to be constructed on the property and thereafter leased to Alliance Day Care Center for a period of 10 years at an annual rental of $33,600.

Wood and Deyle have argued, and the trial court apparently found, that the stock of Trans-Western could not have been issued for services to be rendered, both because of the provision of Neb. Rev. Stat. § 21-2018 (Reissue 1977) and the fact that the stock in Trans-Western was to be issued pursuant to § 1244 of the Internal Revenue Code. 26 U.S.C. § 1244 (1976 & Supp. II 1978). It is true that § 21-2018 provides in part: "No corporation shall be permitted to issue stock except for an equivalent in money paid or labor done, or property actually received and applied to the purpose for which such corporation was created. Neither promissory notes nor future services shall constitute payment or part payment for issuance of shares of a corporation."

Likewise, section 1244 stock may not be issued for services rendered or to be rendered, but may only be in exchange for money or other property, except stocks or securities.

Those facts, however, do not resolve the issues presented by this appeal.

The fact that the stock may not qualify as section 1244 stock goes to its treatment for tax purposes and does not resolve the question of the validity of its

issuance. To begin, the articles of incorporation of Trans-Western permit the issuance of stock for services and make the directors the sole judges of the value of the services. The articles of incorporation of Trans-Western provide in part as follows: "All or any portion of the capital stock may be issued from time to time for such considerations in money, property, services or other right or thing of value, for the uses and purposes of the corporation, as may be fixed from time to time by the Board of Directors, who shall be sole judges of the value of any property, right or thing acquired in exchange for capital stock. All said stock shall be issued fully paid and non-assessable for any purpose."

Furthermore, as earlier noted, each of the parties agreed that Frasier was to receive his shares for work to be performed and that each party was in fact a one-third owner of the corporation. The record leaves little doubt that, in reliance on this agreement, Frasier did in fact perform valuable services for the corporation just as he agreed he would, believing his interest in the corporation was secure, long before any contrary demand was made.

The real question we must answer by this appeal is whether the stock allegedly issued in violation of § 21-2018, but in accordance with an agreement between all of the stockholders, is void in its inception or merely voidable as to certain persons under certain conditions. A reading of the Nebraska Business Corporation Act leads us to the conclusion that a violation of § 21-2018 may cause the stock to be voidable but not void. As an example, § 21-2018 provides in part: "In the absence of fraud in the transaction, the judgment of the board of directors or the stockholders, as the case may be, as to the value of the consideration received for stock shall be conclusive."

We must not lose sight of the fact that this is a suit between informed and consenting stockholders, as opposed to creditors or uninformed stockholders. The

distinction is legally significant.

As one examines the relatively few cases which have addressed this issue, it is clear that the rule which permits a corporation in the first instance and a court thereafter to declare the issuance of stock void or to otherwise obligate a stockholder to make further payment is applied in one manner as it relates to creditors of the corporation and in a totally different manner to stockholders who, with knowledge, participated in the plan which is thereafter attacked by the participating stockholders.

In 18 C.J.S. *Corporations* § 245 at 686 (1939), we find: "By the weight of authority, when there is no constitutional, statutory, or charter prohibition . . . and the rights of other stockholders . . . or of creditors of the corporation . . . are not involved, a corporation has the power to issue shares of its stock as full paid on payment of less than its par value, whether in money or in property, in labor or services, and the agreement under which they are so issued will be binding as between the parties, so that the corporation can neither deny the other party the rights of a stockholder nor compel him to pay for the stock contrary to the agreement . . . ." See, also, 18 Am. Jur. 2d *Corporations* § 268 (1965).

Further, at 18 C.J.S. *Corporations* § 257 d. at 720-21 (1939), we find: "Except when such stock is made absolutely void by statute, in which case the corporation is not estopped from asserting the illegality, even against a purchaser for value and without notice, acquiescence, laches, or estoppel is a bar to relief against stock irregularly issued without consideration on an insufficient consideration, or for less than par. The corporation itself, and all persons participating in or assenting to such issue, are bound thereby and will not be heard to complain . . . ."

In the case of *Kimmel Sales Corporation v. Lauster,* 167 Misc. 514, 4 N.Y.S.2d 88 (1938), an action was brought by Kimmel, as a stockholder on behalf of

Kimmel Sales Corporation, for the cancellation and surrender of certificates representing shares of stock claimed to have been issued to the defendants Roy A. Lauster, Charles C. Peck, and Harold G. Hutchens for insufficient consideration and a determination that the stock was void in their hands under then § 69 of the Stock Corporation Law of New York. In holding that the contesting stockholders were estopped to maintain their claim and must be held to have ratified the action, the court said at 519-20, 4 N.Y.S.2d at 93-94: "The consequences are different where rights of creditors or of the public are involved. Where the controversy is solely between the corporation and its stockholders, it is held that the stockholders unanimously can do what they will with .the corporate assets which are their own. (*Blum v. Whitney*, 185 N.Y. 232; *Gilbert Paper Co. v. Prankard*, 204 App. Div. 83, 88; *Kent v. Quicksilver Mining Co.*, 78 N.Y. 159; *Markson v. Markson's Furniture Stores, Inc.*, 267 id. 137.)

. . . .
"It is said that stock issued in violation of section 69 is prohibited by law, and, therefore, not within the principles of the leading case of *Kent v. Quicksilver Mining Co.* (78 N.Y. 159). Such an interpretation misconstrues the basic distinction there drawn. Where the public is concerned, *e.g.*, in the violation of a statute limiting the powers of a public service corporation (*Berkey v. Third Avenue R. Co.*, 244 N.Y. 84, 90, 92), or where creditors' interests are adversely affected, there can be no waiver or estoppel as a result of action or inaction by the stockholders, but where only the interests of the stockholders themselves are at stake, the contrary holds good. Some statutes are for the protection of stockholders, whereas others are for the protection of creditors or of the public. The same statute under some circumstances protects stockholders alone and under other circumstances protects creditors. No principle of public policy prevents a stockholder from waiving the benefit of a statute enacted for his own protection. He has the power to

surrender voluntarily his own rights whether they are conferred on him by statute or otherwise, provided that he does not destroy rights of others under the guise of parting with his own. Where creditors are involved, the remedy is provided by section 70 and is not to cancel the stock but to hold the stockholder liable to the extent of the inadequacy of the consideration for which it was issued. On the other hand, stockholders whose equity in the assets of the corporation has been diluted by the issuance of shares without lawful consideration, have been granted relief in actions for cancellation upon the theory that the stock is voidable at their election. (*American Macaroni Corp. v. Saumer*, 174 N.Y. Supp. 183. See, also, *Pollitz v. Gould*, 202 N.Y. 11.)"

The *Kimmel Sales Corporation* case goes on further to point out at 521-22, 4 N.Y.S.2d at 96: "'"The very authorities which hold that the declaration that the stock is fully paid and unassessable is not binding upon creditors, also hold that the corporation cannot repudiate it and proceed to collect either from the person receiving the stock or his transferee the unpaid part of the par value * * * There is no doubt that, if this were a suit by creditors to enforce payment of the unpaid portion of the stock subscription, the fact that the stock certificates declared that they were fully paid and unassessable would be no defense; but it is a suit of stockholders in the right of the corporation, and as between the corporation and its stockholders the declaration that the shares are fully paid up and unassessable is a valid one."'"

Likewise, in the later case of *Murray v. Murray Laboratories, Inc.*, 223 Ark. 907, 270 S.W.2d 927 (1954), the Arkansas Supreme Court was presented with a case in which Murray Laboratories sued Dr. Murray to cancel 45 shares of stock issued to and held by Dr. Murray, alleging failure of consideration for said stock, for the reason that the shares of stock were not issued for money or property actually received or

labor done and were in violation of article 12, § 8, of the Constitution of Arkansas, and were therefore void and cancelable. In holding that the stock could not be canceled and must be considered validly held by Dr. Murray, the Arkansas Supreme Court said at 912-14, 270 S.W.2d at 930-32: "There was no innocent third party involved here and no change in the stock ownership. No fraud has been shown. The corporation owes no debts, but on the contrary, has substantially profited. Those seven men, as the only stockholders and directors, who owned the corporation determined among themselves that the value of Dr. Murray's formula to them was $50.00 per share, the par value of the stock.

. . . .

"There is no rule of law better settled than that ""'A party who has had the benefit of an agreement cannot be permitted in an action founded upon it to question its validity. It would be in the highest degree inequitable and unjust to permit a defendant to repudiate a contract the benefit of which he retains.'""""

In *Finch, et al., v. Warrior Cement Corp., et al.*, 16 Del. Ch. 44, 61-62, 141 A. 54, 62 (1928), the Delaware Court of Chancery, in discussing the right of a consenting stockholder to object to the issuance of stock for less than full consideration, said: "If creditors' rights were being asserted against the issuance of the stock to Deer, we would be confronted with an entirely different situation from that which we have here, where a stockholder seeks to undo that which her prior conduct, based on full knowledge, shows she had agreed to and participated in. Acquiescence and participation in an issue of stock, without consideration or for an insufficient consideration, will bar the right of the assenting stockholder to complain against its issuance. In this state the issuance of stock without consideration does not render the issue void, though an attempt to exempt the issue from liability to pay lawful considera-

tion therefor is void. . . . If mere acquiescence with knowledge will estop a stockholder, a fortiori acts of participation will do so. I accordingly hold that the assent and active participation on the part of the complainant, manifested by her exchange of Gulf stock for Warrior stock with full and complete knowledge of all the facts, bar her from any right to complain against the issuance of the twenty thousand shares to Deer, even though it be conceded that no or an inadequate consideration was paid by him therefor. 1 *Cook on Corporations*, (8th Ed.) § 39; 5 *Fletcher, Cyc. Corp.*, § 3586; 14 *C.J.* 477, § 696."

Appellees argue that the provisions of § 21-2018 require our finding that the issuance of stock for less than full value is void regardless of who is involved. The language they rely upon is that portion of § 21-2018 which provides: ". . . and all *fictitious increase* of stock shall be void." (Emphasis supplied.) We believe that appellees misread the statute. What it provides is that the *fictitious increase* is void, not the *stock* itself. This language makes it clear that, notwithstanding that the stock may recite that it is fully paid and nonassessable, creditors may impose liability upon the holders of such stock. An example of the contrary is the Wisconsin statute as it existed prior to repeal in 1953. Wis. Stat. § 182.206 (1953) provided: "No corporation shall issue any stock other than dividend stock, except in consideration of money or of labor or property estimated at its true money value, actually received by it, equal to the par value thereof . . . and all stocks . . . issued contrary to the provisions of law . . . shall be void." See *Frey v. Geuder, Paeschke & Frey Co.*, 4 Wis. 2d 257, 90 N.W.2d 765 (1958). By the provisions of the Wisconsin statute, the stock itself was void and not just the increase.

The provision of § 21-2018 making all fictitious increases of stock void relates to a creditor's right against a holder of "watered stock" and not to the validity of the stock itself. The creditor has a cause

of action against the individual holder because, indeed, the individual holder is a stockholder. Were the courts to hold the stock itself void, the holder could not be liable to the creditor. This is true even though the corporation itself cannot maintain an action. See 19 Am. Jur. 2d *Corporations* § 765 (1965).

An examination of our own statute, as compared to those statutes where the issuance of stock for less than full value are held to be void, makes it clear that our statute does not require that, as between consenting stockholders, we hold the stock to be void. It seems clear that the Nebraska statute follows those lines of cases which determine that issuing stock for less than full value does not cause the stock to be void but only voidable.

An entire examination of this record makes it quite clear that, creditors aside, the payment for the stock was not critical to the operation of this corporation or its success. What appears to be more critical were the efforts made by the parties, including Frasier. It strikes us as being wholly inequitable and improper to permit the corporation and its remaining stockholders to allow Frasier to operate under the belief embodied in the written agreement that he was a stockholder and then remove him just at a point when it appears that a profit would be realized because of his refusal to make a cash capital contribution of funds not needed and previously waived. We believe that the issuance of the stock was only voidable and not void, and neither Wood nor Deyle was in a position to object. They participated and acquiesced in the manner in which the stock was issued to the Frasiers. The fact that a creditor may have another right against the corporation is not significant to this case.

The parties agreed at a pretrial conference that if Frasier was a stockholder, appellees violated § 21-2078 and the Frasiers would be entitled to judgment according to Neb. Rev. Stat. § 21-2080 (Reissue 1977). Such an order should have been entered by

the trial court. We therefore believe that the judgment of the trial court should be reversed and remanded with directions to find that the stock issued to the Frasiers was lawfully and validly issued and owned by the Frasiers at the time that the substantial assets of the corporation were sold, and they are entitled to their statutory rights under the provisions of § 21-2080.

REVERSED AND REMANDED WITH DIRECTIONS.