McPhail *v.* Laughrun.

4-8699                                                   217 S. W. 2d 244

Opinion delivered January 24, 1949.

Rehearing denied February 21, 1949.

*Harrelson, Harrelson & Cannon,* for appellant.

*Norton & Norton,* for appellee.

Griffin Smith, Chief Justice. In an action filed in March 1947, Dr. George T. McPhail, physician and surgeon, alleged an oral contract of partnership with Dr. W. Gus Laughrun, their association in that relationship from April 1, 1946, until September 12 of the same year, Laughrun's failure to abide the agreement, and its termination. The prayer was that a receiver be appointed, that a constructive trust be decreed in the plaintiff's favor on certain real property, and that an accounting be had.[1]

---

[1] *Lis pendens* notice affecting part of lot two of block 59 in Forrest City was cancelled when Dr. Laughrun and his wife deposited $7,000 in Planters Bank & Trust Company as a guarantee fund.

Supplemental to a general denial, Laughrun pleaded applicable sections of the statute of frauds. Pope's Digest, § 6059 *et seq.*

In November 1945, while on army terminal leave, McPhail went to Marianna to practice his profession. After purchasing a home there late in December he became interested in proposals by Laughrun, who enjoyed a profitable practice at Forrest City, sixteen miles distant. The two made temporary arrangements whereby McPhail was compensated at $500 per month. Actually he was paid $600 for work during March. According to McPhail's testimony his venture at Forrest City was at Laughrun's suggestion that if a test period proved mutually agreeable a partnership might be arranged, details of which were not then discussed.

Dr. Laughrun, 45 years of age, went to Forrest City in 1940 and began his practice, and acquired a clinic, with ownership of the real property. He joined the armed forces in 1942, after leasing the clinic to a Dr. Roy for $450 per month. When released from the army in October 1945, Laughrun reassumed control of the clinic. The arrangements with McPhail prior to April 1, 1946, are conceded. Laughrun's contention, however, is that the April contract was merely tentative—a working arrangement to be followed until an addition could be made to the 25-bed clinic building.[2] The actual partnership, he contended, could not be formed until cost of the new structure had been determined, although McPhail's interest would embrace the equipment. But, said Laughrun, when the investment had been determined the partnership would relate back to April 1. A "deed for 30 per cent in the clinic and the equipment" was to be executed. Profit division was to be 30 per cent to McPhail and 70 per cent to Laughrun. This would be increased the second year to 40-60, and 50-50 the third year. Method of payment, according to Laughrun, was not determined, although notes were to be executed, at an undisclosed

[2] The building utilized as a clinic had been sold for $18,000 and repurchased for $25,000. Title was in Hattie Black Laughrun, the Doctor's wife. The terms "clinic" and "hospital" were used interchangeably.

rate of interest. As security McPhail was to execute a mortgage on "his interest" in the clinic. The partnership was "for our lives". September 12, 1946, before the addition had been finished, McPhail "just walked in and said he was through". Some of the equipment for the extension had been bought.

Dr. McPhail testified that he frequently urged that the oral agreement be executed, but that Laughrun kept putting it off, for reasons not involving a denial of the partnership. It was Dr. McPhail's belief that during the period of five months and twelve days, net earnings were approximately $35,000, of which his share would be $10,500 if a partnership should be established. He had drawn $1,657.

Ellsworth Hambleton had been employed by Laughrun as an accountant, and was so engaged when McPhail claims the partnership began. Laughrun, while in his office, told Hambleton he was going to sell McPhail "an interest in the business". This occurred some time in March. Later he was informed the interest would be thirty per cent. Social security records testified to by Hambleton were changed April 1st to show Laughrun & McPhail to be "owners of the business". Other testimony supported McPhail's contention that the two became partners in the *bona fide* belief that by joining efforts there would be mutual advantages. An attorney employed by McPhail became seriously ill shortly after April 1, and later died. The circumstance deprived appellant of favorable facilities for consummation of details the physicians left to the future. Expense of constructing the annex was paid from the joint bank account, where the signature of either was good.

The Court found that no enforcible contract had been entered into and dismissed the complaint, but retained jurisdiction in respect of the bond-deposit of $7,000 if an appeal should be adverse.

We think effect of appellant's brief is to abandon pursuit of the building as such and to treat the relationship as a partnership at will. Since the contract, viewed

from McPhail's standpoint, was not to be performed within a year, and was not divisible, it could not be specifically enforced; nor could an interest in the real property, assuming title had remained in Laughrun, be bound by the conversations McPhail testified to. Laughrun, in effect, contends there was never a meeting of the minds respecting indispensable details—such, for example, as interest on McPhail's notes, when to become due, maximum permissible cash withdrawals for necessary personal expenses, etc. Failure to agree on such matters would defeat enforcement prospectively; but, in determining what the parties intended, reference is had to what they did.

After April 1 McPhail's $500 salary was discontinued, and for all practical purposes he assumed the relationship of a partner. Laughrun took a three-week's vacation to Florida and left McPhail to operate the clinic. Each had a fair understanding of the other's capabilities, and each desired the arrangement. While Laughrun as a witness placed upon their conduct and dealings a construction at variance with McPhail's understanding, it is noteworthy that in important respects their statements do not vary, nor is there any indication of an attempt to conceal essential facts. Balancing against self-interest the conduct of each and the construction they placed upon activities engaged in after April 1, the clear purpose was that McPhail, with less capital than Laughrun, would acquire the interest mentioned and that profits would be sufficient to meet reasonable maturity dates when notes were given.

Result is that McPhail was entitled to an accounting. Court costs and other necessary expenses should be borne on the 30-70 percentage basis.

Reversed.