269 P.2d 854

MUD CONTROL LABORATORIES

v.

COVEY et al.

CHRISTENSEN DIAMOND PRODUCTS

v.

COVEY et al.

Nos. 8025, 8039.

Supreme Court of Utah.

April 26, 1954.

Richards & Bird, Dan S. Bushnell, Salt Lake City, for appellants.

Skeen, Thurman & Worsley, Earl D. Tanner, Verl C. Ritchie, D. Ray Owen, Jr., Dean W. Sheffield, Owen & Ward, Salt Lake City, for respondents.

CROCKETT, Justice.

These two actions were brought by plaintiffs to recover for materials furnished defendants for use in oil drilling operations. Judgment was for plaintiffs, except that Mud Control was not allowed recovery for that portion of its materials which were sold before it qualified to do business in the state of Utah.

Mud Control initiated this appeal, challenging the limitation on its judgment just referred to; the defendants cross appealed in the Mud Control case and appealed against Christensen, assailing the validity of both judgments in favor of the plaintiffs.

We first address the appeal of Mud Control. It is an Oklahoma corporation which sells certain chemicals, referred to in the oil business as "drilling mud." It sold and delivered to defendants $7,458.10 worth between March 7, 1949, and July 27, 1949. On the latter date it qualified to do business in the state of Utah and thereafter sold an additional $765.54 worth of such material for which latter amount the trial court allowed recovery, but upon the basis of section 16–8–3 U.C.A.1953, which provides that if a corporation does business in this state without qualifying its contracts are void, refused to grant judgment for the amount sold prior to qualifying.

Mud Control contends that its sales were in interstate commerce and that the application of section 16–8–3 just referred to would constitute a burden thereon violative of the Federal Constitution under decisions of the United States Supreme Court construing the following clauses of the United States Constitution: [1]

"The Congress shall have Power * * * To regulate Commerce with

---

[1] Sioux Remedy Company v. Cope, 235 U.S. 197, 35 S.Ct. 57, 59 L.Ed. 193; Sonneborn Bros. v. Cureton, 262 U.S. 506, 43 S.Ct. 643, 67 L.Ed. 1095.

foreign Nations, and among the several States, and with the Indian Tribes".[2]

"No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws".[3]

■ Mud Control concedes that unless the sales made before qualifying were sales in interstate commerce, recovery for them was rightly refused, but argues that the sales were in interstate commerce because they were the first sales of goods in the "original package," and therefore fall within the "original package doctrine." Generally stated, this doctrine, which was first announced by Justice Marshall in Brown v. Maryland,[4] is that goods imported into a state are in interstate commerce and free from state regulation and control so long as they are in the original package in which they were placed by the shipper; and this protection extends to the first sale of goods by the importer. Speaking broadly, it has been applied in three categories: (1) taxation of foreign commerce (2) taxation of interstate commerce (3) state regulation of such commerce. Under the facts here we are only concerned with the latter.

■ It seems obvious that the question of "original package" is not the ultimate fact to be determined; it is simply one of the tests to be applied in determining whether goods are actually in interstate commerce. The Supreme Court of the United States so indicated in the case of Baldwin v. G. A. F. Seelig, Inc.,[5] wherein it applied the original package test in holding that a New York statute, which regulated the sale of milk, did not apply to milk imported into the state, but stated "The test * * * is not inflexible and final for the transactions in interstate commerce, * * *."

A case which is closely analogous to the instant one is Walling v. Jacksonville Paper Company,[6] where the Supreme Court was faced with the problem as to whether certain paper products were in interstate commerce. It held that goods shipped into Florida directly to the customer, and those shipped on special order consigned to a branch office designated for delivery to a specific customer, were within interstate commerce, but that goods which were shipped to the branch warehouse, to be held subject to the taking of orders from a fairly stable group of customers, had come to rest, and were thereafter not interstate commerce, but commerce within the state. Similarly in Dalton Adding Machine Sales Company v. Lindquist,[7] the Dalton Company maintained an agent and office in the state of Washington; machines were sent to the agent and were sold by him and his

2. U.S.Const. art. 1, § 8.
3. U.S.Const. art. 1, § 10.
4. 12.Wheat. 419, 6 L.Ed. 678.
5. 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032.
6. 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460.
7. 137 Wash. 375, 242 P. 643, 646.

assistants throughout the state. The court characterized such transactions as follows: "It [the company] ships no goods upon the orders taken by its agents. On the contrary, it ships its machines to its agents before any such orders are taken, * * *. Before any sale is attempted, the machines are within the state. They have come to * * * rest, and are a part of the general property within the state, protected by the laws of the state, and subject to the same conditions with respect to their disposition as like property generally within the state", and held the business so conducted to be *intra*state rather than *inter*state.

 The principles in the foregoing cases are applicable to the fact situation we have here. Mud Control products were trucked into Vernal, Utah, where they were placed on the property of one L. N. Liscombe and there kept under tarpaulins pending sale. Their Mr. Putnam, who handled sales and customer relations, contacted Baird and Robbins and arranged to sell them drilling mud. Whenever it was required, one of the oil crew went to the Liscombe premises and obtained the mud by signing a delivery ticket. When such products were deposited for warehousing, subject to distribution upon orders to be taken, their transit in *inter*state commerce had come to an end. Subsequent sales by Mud Control were in *intra*state commerce and subject to regulation by the laws of Utah. Mud Control having failed to qualify to do business within the state, the trial court properly held its contract void and refused to allow recovery for that portion of its products which were sold before qualifying.

The appeal of the defendants challenges the finding of the trial court that they were partners with Baird and Robbins in drilling an oil well known as Bertie Slaugh No. 1 in which the materials in question were used. They aver that Baird & Robbins Drilling Co., Inc., a corporation, (herein called the Drilling Corporation) drilled the well, and that they bore no partnership relation to either said drilling corporation or to Baird and Robbins.

The essential facts appear to be that M. E. Baird and H. L. Robbins were in partnership known as Baird and Robbins Drilling Company or simply Baird and Robbins, engaged in exploration and drilling on certain oil leases in Uintah County. For the purpose of raising capital to finance their operations they entered into a "Joint Operating Agreement" with the Defendants by which the latter agreed to advance $16,000 to be used in drilling the first well. It provided that Baird and Robbins would either drill the well themselves or have it done by the Drilling Corporation, which they had previously created and exclusively controlled. The trial court found that the Corporation was a fraud, and a fiction, that it had no separate existence insofar as the well drilling was concerned. The defendants charge that this finding is not supported by evidence. The legal status of such corporation is of no moment to us in the

instant case, because the court found that the Baird and Robbins partnership, not operating through said Drilling Corporation, in conjunction with the defendants as partners, drilled the well. The question is whether the evidence would reasonably support the determination made by the trial court.

No evidence was introduced showing that the corporation had entered into a contract to drill the well; nor were the plaintiffs told that it was a corporation which was purchasing the materials and equipment. In procuring drilling equipment from plaintiff Christensen, Mr. Baird told them that he had a silent partner named Robbins in Pocatello and that others in Salt Lake had an interest in the well. The sales invoices were made out to Baird & Robbins Drilling Co. or simply to Baird & Robbins by both Christensen and Mud Control, containing no reference to a corporation. The corporation had an account in the bank of Vernal from which some expenses were paid, but the bulk of the drilling expenses were paid from a partnership account in the Continental Bank and Trust Company of Salt Lake City in the name of Baird & Robbins Drilling Co. Fifteen days after entering into the joint operating agreement with Coveys, a new signature card on this account was filled out in which they still char-

acterized themselves as a partnership doing business under the name of Baird & Robbins Drilling Co.

At the commencement of this action Mud Control served on the Coveys a request for admissions under rule 36(a) U.R.C.P., which read:

"That, pursuant to said joint operating agreement defendants M. E. Baird and H. L. Robbins commenced to drill an oil well known as Bertie Slaugh No. 1 on the land described in the complaint herein, and were in process of said drilling operations between March 1, 1949, and July 29, 1949."

to which the Coveys made the following answer:

"During 1949 and prior to July 29, 1949, the defendants Baird and Robbins commenced drilling the Bertie Slaugh No. 1 well on the land described, and the said drilling was commenced after the joint operating agreement was executed."

but made no reference to any contention that the well was drilled by the Drilling Corporation. Mud Control correctly contends that under the interpretation given, the comparable rule in the Federal Rules of Civil Procedure, Rule 36, 28 U.S.C.A., the Coveys are precluded from adducing any proof to the contrary.[8]

8. Bowles v. Batson, D.C.S.D.1945, 61 F. Supp. 839, affirmed, Batson v. Porter, 4 Cir., 154 F.2d 566; International Carbonic Engineering Co. v. Natural Carbonic Products, D.C.S.D.Cal., 1944, 57 F.Supp. 248.

Viewing the evidence and all fair inferences therefrom in the light most favorable to plaintiffs,[9] we believe it is sufficient to support the finding of the trial court that Baird and Robbins as a partnership, and not the drilling Corporation, drilled the well. This brings us to the question whether the trial court was justified in holding the defendants responsible as partners of the Baird and Robbins partnership. Plaintiffs based their claim upon the theory that defendants' joint venture with Baird and Robbins was a mining partnership. It is here pertinent to inquire as to its attributes and whether they are met by the facts.

Mining Partnerships developed as a special type of partnership peculiarly adapted to serve the mining industry (including the oil and gas field). This entity has been recognized by us although it has never been codified by our legislature. Sumner, in his work on oil and gas,[10] says: "In the western states where the mining partnership was first recognized, joint ownership and operation of land for mineral purposes was held sufficient to create the relationship. In other states where the relationship has been recognized and applied to various types of mining, except in Pennsylvania, Oklahoma and probably Texas (where the additional element of an express agreement to share profit and losses is required), the requisites for its creation and existence remain the same." In the case of Bentley v. Brossard,[11] we approved this concept, saying:

" 'A mining partnership arises when two or more co-owners of a mining claim actually engage in working the same * * *' " and also there set out the salient differences between general and mining partnerships.

The defendants assert that two elements essential to a mining partnership are lacking here: first, joint operation or control, and second, an agreement to share losses. Their position is that they were simply investors who purchased an undivided 12 per cent interest in the leases, and that they were nothing more than tenants in common with Baird and Robbins. We are concerned with the question whether it must be said as a matter of law that they retained such status, or will the evidence sustain the trial court in holding them responsible as partners for the necessary expenses in the adventure.

As to joint operation: it appears that they secured to themselves rights of control and protection of their investment beyond what mere investors ordinarily have. Defendants required Baird and Robbins to enter into the "Joint Operating Agreement" as a condition to advancing money. It is true that the agreement recited that Baird and Robbins had the sole right to explore and develop the land and to hire and con-

9. Toomer's Estate v. Union Pacific R. Co., Utah, 239 P.2d 163. . .

10. Sumner on Oil & Gas, permanent edition, vol. 4, sec. 724.

11. 33 Utah 396, 94 P. 736, 743.

trol employees. But an examination of the terms of the somewhat extensive agreement, consisting of 17 pages, which the defendants had prepared, indicates that they actually had it in their power to exercise a considerable degree of control over the operation. They retained one-half of the $16,000 which they were to furnish, and were not to pay it until Baird and Robbins commenced drilling a well on the leased property. The well was not to deviate in excess of 3 degrees from the perpendicular, and was to be drilled in accordance with certain specified standards. The defendants were to have free access to the operation at all reasonable times, and were entitled to copies of various reports of operations, samples, and cuttings of the well and other information concerning the drilling. Their consent was also required before any well which had produced in commercial quantities for 30 days could be abandoned. The agreement further provided for the continuance and extension of the joint venture if the first well proved successful.

 In order to meet the requirement of joint operation it is of course not necessary that the operation or control of the activities be equal. It is obvious that if the other elements of partnership exist there can be division of duties and responsibilities insofar as management and control are concerned, without destroying the partnership.

As was said in Harper v. Sloan:[12] "We do not understand that it is essential to a mining partnership that each of the partners actually perform physical work upon the claim. Where one of them supplies money which is to be used in working the claim, he is engaged in such work as truly as is the one who devotes his own labor to the enterprise." We are of the opinion that the circumstances here shown, sufficiently indicate a joint control over the working of mineral interests by co-owners for a profit to support the trial court's determination that the requirement of joint operation has been met.

 The defendants point out that by the agreement their liability is specifically limited to $16,000 and insist that the lack of an express agreement for the sharing of losses precludes the existence of a mining partnership. Their argument has been answered by this court in Bentley v. Brossard[13] wherein we held that an agreement to share losses is not a condition precedent to the existence of a mining partnership. Cases to the contrary cited by defendants are, with but one exception, from Oklahoma which is not in harmony with the law in Utah and a majority of the states. People do not ordinarily enter into partnership for the purpose of incurring losses. It is not unusual for such relationships to come into being, either by operation of law, or by ex-

12. 177 Cal. 174, 169 P. 1043, 1046, 181 P. 775.

13. See note 11, supra.

press agreement, without the partners setting forth their obligations as to losses that may accrue. Responsibility for such losses is simply an incident of the partnership relation. It is elemental that when a partnership is created, an agreement between its partners limiting liability is not binding on third parties. Were it otherwise, partners could, by private agreement between themselves, obtain the advantages of limited partnership without complying with the statutory requirements.[14]

There is no doubt that mining partners can bind their associates with respect to such transactions as may be necessary to carry on the purposes of the business. We expressly so held in the case of Bentley v. Brossard.[15] The materials here furnished fall within that category. We are of the opinion and hold that the evidence supports the finding and conclusions of the trial court. Judgment affirmed. Costs to respondent, Christensen Diamond Products Co.; other parties to bear their own costs.

McDONOUGH, HENRIOD and WADE, JJ., concur.

WOLFE, C. J., does not participate herein.

14. Section 48-2-2, U.C.A.1953.
15. See note 11, supra.