Murray *v.* Murray Laboratories, Inc.

5-358 270 S. W. 2d 927

Opinion delivered June 28, 1954.

[Rehearing denied October 4, 1954.]

908

 █ 

*Price Dickson* and *W. B. Putman,* for appellant.

*Courtney Crouch, Rex W. Perkins* and *E. J. Ball,* for appellee.

J. SEABORN HOLT, J. Appellee, Murray Laboratories, Inc., sued appellant, Dr. Murray, to cancel 45 shares of stock, issued to and held by Dr. Murray, alleging failure of consideration for said stock, for the reason that said shares of stock were not issued for money or property actually received or labor done and were in violation of Article 12, § 8 of the Constitution of Arkansas, and were therefore void and cancellable.

Dr. Murray filed answer and cross-complaint in which he denied failure of consideration and prayed for an accounting and decree for his portion of the earnings of the corporation.

Trial resulted in a decree cancelling Dr. Murray's stock in accordance with appellee's prayer, and refused his plea for an accounting and restitution to him. This appeal followed.

The evidence discloses that Dr. Murray was a graduate veterinarian from Texas A. & M. College, having received a D.V.M. degree from that institution. While at Texas A. & M. Research Center, he studied the techniques of culturing and testing the strength of various species and strains of viri and the making of live virus vaccines. Dr. Murray, having conceived the idea of setting up a manufacturing laboratory in Northwest Arkansas, the center of a great chicken broiler industry, went to Fayetteville and interested six of the leading broiler producers in that area in his proposition. A corporation

was duly organized and on August 22, 1951, one hundred shares of capital stock, with par value of $50.00 per share, were issued, Dr. Murray receiving 46 shares (for one of which he paid $50.00 in cash) and 45 shares were issued to him for his formula for Newcastle Disease vaccine, representing $2,250.00 of the capital stock. The remaining stockholders, six broiler producers, subscribed and paid for nine shares each at $50.00 a share or a total paid by these six stockholders of $2,270.00. This stock was issued to these seven original, and only stockholders and directors by agreement.

Dr. Murray assumed his duties August 1, 1951, as manager and director of appellee, Murray Laboratories, Inc. The corporation began operations in August, 1951, and as of March 31, 1952, showed an earned surplus of $25,260.00, or a total of $30,730.26, including the value of Dr. Murray's stock, issued to him for the formula above mentioned. During all this operation, Dr. Murray acted as laboratory director, and the sole product manufactured and sold by the corporation was Dr. Murray's Newcastle vaccine.

Differences and friction having arisen, Dr. Murray tendered his resignation on March 31, 1952, and in writing demanded his share of the earnings of the corporation up to that time, or that he be reimbursed for his stock, in accordance with the stock subscription agreement which he claimed the corporation had with him. The written proposal of Dr. Murray contained these recitals: ''I sell my stock in the corporation as provided in the stock subscription agreement, the book value as of March 1, 1952, being $12,337.20, and resign as general manager on April 1, 1952, or prior thereto upon payment of the value of my stock, at the discretion of the directors. II. I purchase all outstanding stock of the remaining 6 stockholders, computed on the same basis, sales to be consummated and stock delivered on or before April 1, 1952.''

It appears that Dr. Murray was the originator of the plan to manufacture vaccine for Newcastle Disease in poultry.

At the first meeting of the Board of Directors on August 4, 1951, (regular meetings were held each month thereafter), the minutes contained these recitals: ''After some discussion a motion was unanimously adopted that Dr. W. L. Murray be employed and retained as General Manager of the Laboratories to be operated by this Corporation at a salary of $300.00 per month, beginning on the 1st day of August, 1951. . . .

''WHEREAS, Dr. W. L. Murray, who has been retained as General Manager of the Laboratories of this Corporation, has developed a vaccine for the treatment of Newcastle Disease and, WHEREAS, Dr. W. L. Murray is conducting research for other vaccines, medicines, and formulas, for the treatment of diseases of poultry and livestock and, WHEREAS, the formula already developed by Dr. W. L. Murray is needed by this Corporation to manufacture vaccine for the treatment of Newcastle Disease and, WHEREAS, Dr. W. L. Murray has agreed to turn over all property rights in said formula to this Corporation, as well as all property rights in other formulas developed by him while in the employ of this Corporation, in exchange for forty-five shares of the capital stock of this Corporation and, WHEREAS since said formulas are needed by said Corporation, it is the belief of this Board of Directors that they are reasonably worth $2,250.00,

''NOW THEREFORE, BE IT RESOLVED that this Corporation issue to Dr. W. L. Murray forty-five shares of its capital stock at its par value of $50.00 per share in exchange for the Newcastle vaccine formula developed by him and in exchange for any formulas subsequently developed by him for the treatment of diseases of poultry and livestock, as well as any formulas developed for human use and consumption,

''BE IT FURTHER RESOLVED that all such formulas developed by the said Dr. Murray, while in the employ of this Corporation, shall become the sole and exclusive property of this Corporation, even though the same might be copyrighted in his individual name, and,

"BE IT FURTHER RESOLVED that the President and Secretary of this Corporation enter into an appropriate agreement with the said Dr. W. L. Murray in respect to the exchange of shares of stock for said Newcastle vaccine formula, and any other formulas subsequently developed by him while in the employ of this Corporation.

"The following resolution was unanimously adopted: BE IT RESOLVED that the Corporation rent from Louis M. Heerwagen a building located at 304 Johnson Street, at a monthly rental of $50.00 per month, which building shall become the general offices and headquarters of this Corporation."

At a meeting of the Board November 20, 1951, Dr. Murray's services appeared so satisfactory that his salary was, by unanimous vote, increased to $400.00 per month. Minutes of Board meetings thereafter reflect continuous increase and growth in assets of the corporation. It appears undisputed that a satisfactory vaccine was produced by Dr. Murray in November, 1951, and used by the corporation as long as Dr. Murray remained with it and that this formula was delivered to the corporation at Dr. Murray's resignation. It also appears that this formula was duly filed with the Arkansas State Board of Health, shortly after the corporation was organized.

Following Dr. Murray's resignation, Dr. Wadsworth was employed in his stead on a month to month basis, at a salary of $500.00 per month.

The minutes of January 8, 1952, recite "satisfactory results were reported on the performance of the company's vaccine."

The record reflects that Dr. Murray's formula in question provides:

"FORMULA NEWCASTLE DISEASE VIRUS VACCINE

two eight

"The formula is based on a four, six ratio. The virus is a mild strain of Newcastle virus which does not ordinarily cause the bird to exhibit symptoms of the disease, and will constitute the former of the above ratio. The diluent will be composed of a physiological saline solution, and will be the latter of the above ratio."

The minutes of appellee's Board of Directors disclose that as early as October, 1951, all directors were aware of and made recommendations in regard to the ratio of virus to diluent, that is, the strength of the vaccine; that in November, 1951, the Board agreed to adopt a 20% solution, or a 2-8 ratio, continuing tests on a 10% solution. The Directors were cognizant of every change made in the ratio and, as indicated, after many experiments with the vaccine made by Dr. Murray, with the Directors' knowledge and consent, a suitable vaccine was perfected, accepted, and used from November, 1951, to March 31, 1952, when Dr. Murray resigned, and assets grew from $5,000.00 to approximately $30,000 up to March 31, 1952. Since Dr. Murray's resignation, the corporation appears to have continued operations under the same corporate name.

There was no innocent third party involved here and no change in the stock ownership. No fraud has been shown. The corporation owes no debts, but on the contrary, has substantially profited. Those seven men, as the only stockholders and directors, who owned the corporation determined among themselves that the value of Dr. Murray's formula to them was $50.00 per share, the par value of the stock.

The principles of law announced in *Kimmel Sales Corp.* v. *Lauster, et al.*, 167 Misc. 514, 4 N. Y. S. 2d 88, apply with equal force here. "The consequences are different where rights of creditors or of the public are involved. Where the controversy is solely between the corporation and its stockholders, it is held that the stockholders unanimously can do what they will with the corporate assets, which are their own. . . . Where the public is concerned, *e. g.*, in the violation of a statute

limiting the powers of a public service corporation. *Berkey* v. *Third Avenue Ry. Co.,* 244 N. Y. 84, 90-92, 155 N. E. 58, 50 A. L. R. 599, or where creditors' interests are adversely affected, there can be no waiver or estoppel as a result of action or inaction by the stockholders, but where only the interests of the stockholders themselves are at stake, the contrary holds good. . . . 'An issue of stock by a corporation as a bonus or gratuity, at less than its par value, or on payment therefor in property at an overvaluation is binding . . . by estoppel, even when in violation of a constitutional or statutory provision, upon participating, consenting or acquiescing stockholders and their transferees, so that they cannot sue to set the transaction aside. . . .' 14 Corpus Juris, p. 452, § 613; *Id.,* p. 449, § 609.''

They, as the seven directors, fully understood and agreed, as reflected by the minutes above of their regular monthly meetings, that Dr. Murray's formula in the beginning was not perfect or satisfactory, that he was to experiment and develop one that would be satisfactory to them, and the preponderance of the evidence shows that he did develop such a satisfactory formula three months before he resigned, and that the corporation operated under it to their substantial benefit, that is increasing an initial investment of $5,000 to approximately $30,000.

Jeff Brown, one of the directors, testified: ''Well, in short, after some period of experimentation in producing the formula some formula was hit upon which satisfied you and the other incorporators? A. That's right. Q. And following that period of time did you and the others, if you know, purchase that vaccine from the corporation and use it on your flocks? A. Yes, sir. Q. Did you sell it commercially as a distributor? A. I didn't, some of the others did, I used mine. Q. Now, Mr. Brown, do you know what results followed with respect to those buyers who bought it commercially and used it on their flocks? A. Well, I think most of them are pretty well pleased; I wasn't selling any, I don't know much about that. . . . Can you give me any idea, Mr. Brown, as to about when it began to appear that a suitable vaccine

mix had been worked up? A. No, I would have to guess at that, I would guess about November. Q. Is it true, then, that from about November on that reasonably proper and reasonably satisfactory results were obtained from the use of the vaccine? A. Reasonably, yes, sir. Q. Are you in position to say whether you and the other incorporators from that time on got quantities of the vaccine for use on their own flocks? A. We did.''

The value of the consideration for the 45 shares of stock issued to Dr. Murray was determined by the judgment of the seven directors (the only stockholders) which is conclusive.

''Shares of stock other than shares without nominal or par value may be issued only for a consideration having a value in the judgment of the Board of Directors of the corporation at least equivalent to the full par value of the stock so to be issued; and in the absence of fraud, or wilfull over or under valuation in the transaction, the judgment of the directors as to the value of any such consideration shall be conclusive.'' (§ 64-208, Ark. Stats., 1947.)

Here, it appears undisputed that these 45 shares were issued to Dr. Murray for a vaccine formula. The question of the validity of stock in a corporation issued in consideration of a formula, as here, has never been presented to this Court. It is unnecessary, however, for us to determine whether this formula constituted property which Art. 12, above contemplated. On the facts presented by this record, we have concluded that the trial court erred in holding, in effect, that Dr. Murray's shares were void and should be cancelled under said Art. 12 for the reason that it is not controlling, in the circumstances.

There is no rule of law better settled than that '' 'A party who has had the benefit of an agreement cannot be permitted in an action founded upon it to question its validity. It would be in the highest degree inequitable and unjust to permit a defendant to repudiate a contract the benefit of which he retains.' '' *State ex rel. Inde-*

*pendence County* v. *Citizens Bank & Trust Company,* 119 Ark. 617, 178 S. W. 929.

It appears that six of the stockholders, the broiler producers, have claims against the corporation arising in various ways. The validity and amount of these claims should be determined and charged against the corporation assets before appellant obtains relief.

Accordingly, the decree is reversed and the cause remanded with directions to the court for further proceedings consistent with this opinion.