L. Bryan BERGESON, Plaintiff,

v.

LIFE INSURANCE CORPORATION OF AMERICA, a corporation; Cleo H. Bullard; Lewis R. Rich; Adrian S. Wright; W. Meeks Wirthlin; Harry D. Pugsley; Robert L. McGee; Lawrence H. Birrell; Herbert J. Zimmerman; J. Robert Thomas, Defendants.

No. C-61-57.

United States District Court
D. Utah,
Central Division.

May 2, 1958.

Judgment Affirmed in Part and Reversed in Part March 16, 1959.

See 265 F.2d 227.

George M. McMillan, of McKay, Burton, McMillan & Richards, Salt Lake City, Utah, for plaintiff.

Jack B. Darragh, Salt Lake City, Utah, for defendant Cleo H. Bullard.

Joseph C. Fratto, Salt Lake City, Utah, for defendant Lewis R. Rich. S. N. Cornwall, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah,

for defendants Adrian S. Wright and W. Meeks Wirthlin.

Harry D. Pugsley, of Pugsley, Hayes & Rampton, Salt Lake City, Utah, pro se.

Ray R. Christensen, of Moreton, Christensen & Christensen, Salt Lake City, Utah, for defendants Lawrence H. Birrell, Herbert J. Zimmerman and J. Robert Thomas.

CHRISTENSON, District Judge.

This is a derivative action by a stockholder on behalf of the Life Insurance Corporation of America against former directors who allegedly caused the corporation to issue capital stock to themselves of a value of approximately $40,300 without the corporation's receiving any value therefor. The complaint was in two counts. Summary judgment for all defendants was granted on the first count. The second count is against defendants Bullard, Wright, Wirthlin, Rich and Pugsley. Summary judgment was granted Pugsley on the second count, which is more explicitly discussed later in this opinion. Unless otherwise indicated, Bullard, Wright, Wirthlin and Rich will be referred to as "defendants".

The case against the defendants as to the second count has been submitted upon the depositions on file and a stipulation of facts. The stipulation of facts, incorporated by reference as findings of fact, is briefly as follows:

Sometime during 1951 the partnership known as LICOA Agency was formed. The defendants and some persons not parties to this action owned an interest in this partnership. The partnership caused the organization of a mutual benefit life insurance company known as "The Life Insurance Corporation of America." The partnership contributed money, property and services to the company and in return received an agreement by the mutual company to pay commissions on all insurance sales of the company. The defendant members of the partnership were the officers and directors of the company. In the summer of 1952 the policyholders voted to change from a mutual company to a stock company. Application was made to the Securities Commission of the State of Utah to make a public offering of 20,000 shares of stock, par value $10, for $20 a share. A stock sales program was instituted with the knowledge of the Insurance Commissioner of the State of Utah. Plaintiff purchased 80 shares at this time. No indication was given by the partnership to prospective purchasers that the amounts which had been contributed by it up to that time ($23,888.17 in cash and $4,145 in furniture and fixtures) would be treated or enforced as a liability of the mutual company. The books of the mutual company did not show any liability to the partnership for these advances which, on the contrary, had been treated as contributed surplus. The partnership did carry them on its own records as an account receivable from the mutual company. By June, 1953, the mutual company was insolvent and any claim that the partnership might have had against it was valueless.

There was no showing that the investing public or other policyholders of the mutual company were ever informed of the agreement by the mutual company, which purported to be binding on the stock company, to pay commissions to the partnership on all insurance sales. There was no showing that the investors, such as plaintiff, were informed of the purported liability to the partnership. Indeed, it may fairly be inferred from the facts before the Court that quite the opposite was true.

In June, 1953 the partnership executed a note in the amount of $25,000 in favor of the stock company and a stock certificate for 1,250 shares was filled out in favor of the partnership but was never delivered. In March of 1954 the Insurance Commissioner disallowed several assets of the stock company, among which was the $25,000 note of the partnership. The stock company thereupon wrote the note off and cancelled the stock certificates. Meanwhile, the partnership had been dissolved and the only

asset which it claimed was a claim against the stock company for $40,300.17 which consisted of the amounts previously advanced and referred to here, and $12,267 in claimed commissions on insurance sales of both the mutual and stock companies.

In March and April, 1954 the directors issued to the partnership as fully paid stock 1,863 shares and in August, 1954 another 127 shares, in satisfaction of the claim of the partnership and for a release from the alleged contract. The shares were distributed in part to the defendants herein as follows: Bullard, 622 shares; Wright, 260 shares; Wirthlin, 260 shares; Rich, 130 shares. The defendants, except Rich, had acted as the board of directors in approving and authorizing the issuance of this stock. Defendant Rich had ceased to be a member of the board of directors on September 26, 1953. The stock company then became insolvent in 1955 and was reorganized. The plaintiff and defendants were given one share in the reorganized company for every 13.5324 shares held by them in the old company. Additional findings of fact, not inconsistent with the stipulated facts, are made in the remainder of the opinion.

 Under the facts of this case the corporation has a right of action against the defendants. The rule believed to be controlling here is that announced in the early case of Hayward v. Leeson, 176 Mass. 310, 57 N.E. 656, 49 L.R.A. 725. A corporation can recover from promoters who controlled it the value of stock issued to them in exchange for property in excess of its reasonable value. This is so even though the corporation while controlled by the promoters ratified the transaction. Old Dominion Copper Mining & Smelting Co. v. Bigelow, 188 Mass. 315, 74 N.E. 653, second opinion at 203 Mass. 159, 89 N.E. 193, 40 L.R.A.,N.S., 314 affirmed 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009. The Tenth Circuit recently followed these cases in San Juan Uranium Corporation v. Wolfe, 1957, 241 F.2d 121, 123, saying, " * * * the techni-

cal assent of the corporation through its promoters to the deceptive transaction is no defense to an action by the corporation when freed of its bonds."

The defendants seek to invoke a principle applied in Johnson v. Louisville Trust Co., 6 Cir., 1923, 293 F. 857, and annotated in 56 A.L.R. 396. In this case, however, the original incorporators were the only stockholders and the only ones contemplated. The plaintiff there argued that any transaction between the corporation and its promoters was void if the promoters benefited from the transaction. In answering that contention the Court stated (at page 861):

"Conceding, for the purposes of this opinion, that such would be the result in case of fraud, concealment, or misrepresentation, coupled with mere majority action, *or as against new stockholders,* such rule would scarcely seem applicable where, as here, there is, as found by the referee, an absence of fraud, misrepresentation, or concealment, where everything was open, where all interested parties concurred, where the corporate action merely carried out the previously existing agreement, * * * *where no new stockholders' rights have intervened,* and where nothing seems to have been done to mislead or deceive prospective creditors." (Emphasis added.)

In the present case there was fraud within the meaning of Hayward v. Leeson, supra [176 Mass. 310, 57 N.E. 660], wherein the Court stated:

"It is a fraud for promoters to undertake to decide for the future stockholders in the corporation to be organized that one-third of the whole capital stock of that corporation is a fair remuneration for their services as promoters, * * * without disclosing that fact to the subscribers, and without getting their consent to the payment of that remuneration."

It is likewise fraud not to disclose to prospective owners the extent of lia-

bilities of the corporation to the promoters in order to enhance the capital position of the company, and to issue stock to the promoters in satisfaction of this liability. This is particularly true when, by not showing the liability, a sizable deficit is turned into a moderate surplus.

In Taylor v. Citizens' Oil Co., 1918, 182 Ky. 350, 20^ S.W. 644, the Kentucky court, in construing constitutional and statutory provisions similar to those of Utah,[1] allowed a corporation to recover from promoters the inflated value of property which they had transferred to the corporation for common stock. Utah has permitted creditors to recover under similar conditions. Henderson v. Turngren, 1894, 9 Utah 432, 35 P. 495; Salt Lake Hardware Co. v. Tintic Milling Co., 1896, 13 Utah 423, 45 P. 200. Although there are no cases directly in point in Utah, in Roberson v. Draney, 1918, 53 Utah 263, 178 P. 35, 37, the court reviewed the general authorities in this area and noted approval of the doctrine of the Old Dominion Copper cases, supra. The Utah court distinguished the case before it on the ground that the evidence was conclusive "that there was neither fraud, concealment, deception, nor misrepresentation on the part of (defendants)." The plaintiff stockholders in that action knew and consented, and in fact, benefited from the transaction of which they complained. It seems reasonable to assume that the Utah court would follow the direction of these comments to allow recovery in this type of action if presented to it. This Court will do so on the basis of this considered assumption of the Utah law and as commended by the weight of authority generally.

■ A transaction between a corporation and those who control it will not bind the corporation unless it was a fair and honest bargain. Dickerman v. Northern Trust Co., 176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423. In determining if this stock was issued in a fair and honest bargain it is necessary to inquire into the consideration which was given by the defendants. It consisted of two main parts: the alleged contract between the company and the partnership concerning rendition of certain managerial services to the company in return for overriding commissions on all insurance sales for the next fifteen years, and the advancement of funds and office equipment to the company in order to get it started in business.

■ The contract was clearly invalid. It was in violation of both the spirit and letter of 31–7–7 and 31–7–10(3), Utah Code Annotated 1953.[2] Defend-

---

1. Constitution of Utah, Art. XII, § 5.
 "[Corporate stock—Issuance, increase, and fictitious increase.] Corporations shall not issue stock, except to bona fide subscribers thereof or their assignee, nor shall any corporation issue any bond, or other obligation, for the payment of money, except for money or property received, or labor done. * * *"
 Utah Code Annotated 1953.
 "16–2–7. Payment of subscriptions with property.—Where subscriptions to the stock of any corporation, except corporations organized for mining or irrigation purposes, shall consist in whole or in part of property necessary to the pursuits agreed upon, the articles of incorporation shall be further supplemented by the affidavits of three persons to the effect that they are acquainted with such property and that it is reasonably worth the amount in cash for which it was accepted by the corporation."

 "16–2–37. Payment for stock by transfer of property.—Where property has been taken upon subscription to the stock the owners of such property shall be deemed to have subscribed such amount to the stock of such corporation as will represent the fair estimated cash value of so much of such property or of such interest therein as they may have conveyed to such corporation by deed actually executed and delivered."

2. Utah Code Annotated 1953.
 "31–7–7. Contracts prohibited—Abdication of control of insurer—Exclusive contracts—Approval of contracts by commissioner.—(1) No incorporated domestic insurer shall enter into any contract the effect of which would be to grant or surrender the control and management of the insurer to any person. (2) No incorporated domestic insurer shall make any contract whereby any person is

ants realized that such a contract might have to be filed under the provisions of section 31-7-7 and attempted to do so. According to defendant Bullard, who was president of the company, the commissioner refused to file the agreement because he could see no reason for cluttering up his files with it. I cannot accept this explanation. It is more probable that the Commissioner refused to file and approve the agreement because it violated the law. Even if this were not the case, the contract is invalid as being in contravention of 31-7-10(3). The fact that a partnership is an intermediary between the company and the defendants as individuals does not blur the realities of the situation. What happened to this company is exactly what the statute was designed to prevent. Allowing the officers of the company to receive commissions on all of the insurance premiums received by the company obviously impaired their ability to distinguish between good and bad risk policies. And it is alleged by defendants that because of heavy losses on its policies the company came into early financial difficulty. Since the contract was invalid, the cancellation of it could not be consideration for the issuance of the stock to the partnership.

■ The alleged advances made by the partnership to the mutual company must also be considered as invalid and insufficient to comprise consideration. The defendants studiously avoided letting anyone know about this supposed liability. Defendant Bullard stated that this was because it would show the company to be insolvent, as indeed it was. Since the Utah statutes[3] provide for a method for a mutual insurer to borrow money and there is no evidence that the defendants saw fit to comply with it, there is no alternative but to find that this was contributed surplus just as they represented it to be to all prospective stockholders. Even if there had been compliance with section 31-9-29, there is no way that the alleged liability could have been repaid under the restrictions imposed by section 31-9-30[4]. The com-

granted or is to enjoy in fact the exclusive or dominant right to produce the entire insurance business for the insurer unless such contract is filed with and approved by the commissioner. * * *
"The commissioner shall not approve any such contract referred to in paragraph two of this section which: (1) subjects the insurer to excessive charges for expenses or commissions; or (2) vests in such person any control over the general affairs of the insurer to the exclusion of its board of directors or officers; or (3) is to extend for an unreasonable length of time; or (4) contains other inequitable provisions or provisions which may jeopardize the security of policyholders."
"31-7-10. Unlawful payments of salaries, compensation or pensions to officers, directors or employees.—No domestic insurer shall: * * * (3) pay to any person who has the power to decide which applications to the insurer for insurance are to be accepted or rejected, any compensation related to income upon risks so accepted, except upon the net profits therefrom."

3. Utah Code Annotated 1953.
"31-9-29. Power of mutual insurer to borrow money—Status of borrowed money—Approval of loan by commissioner—Loan agreement—Commissions.—(1) A domestic mutual insurer on the cash premium plan may, with the commissioner's advance approval and without the pledge of any of its assets, borrow money to defray the expenses of its organization or for any purpose related to its business upon an agreement that such money and such interest thereon as may be agreed upon, not exceeding six per cent per annum, shall be repaid only out of the insurer's earned surplus in excess of its required minimum surplus. (2) Any money so borrowed shall not form a part of the insurer's legal liabilities or be the basis of any set-off; but until repaid, financial statements filed or published by the insurer shall show as a footnote thereto the amount thereof then unpaid together with interest thereon accrued but unpaid."

4. Utah Code Annotated 1953.
"31-9-30. Funds for repayment of loan—Restrictions upon repayment of loan.—(1) the insurer may repay any such loan referred to in section 31-9-29 of this title, only out of its realized net earned surplus in excess of the minimum surplus required for the kinds of insurance transacted. No such loan shall be

pany was insolvent at the time of the conversion from a mutual company to a stock company and could not legally have repaid the advance. It is true that the stock company could have assumed the liabilities of the mutual company. But the fact is, it didn't. The promoters knew of the existence of the purported liability and yet failed to disclose it to the prospective stockholders. The subsequent technical recognition of the liability by the stock company while it was under the sole control of the defendants does not bind the corporation. San Juan Uranium Corporation v. Wolfe, supra. If we ascribe an innocent intention on the part of the defendants in making these representations the only conclusion that can be drawn is that the defendants intended the advanced money as contributed surplus. It seems quite clear, however, that the defendants perpetrated a fraud on the corporation and subsequent stockholders within a meaning of Hayward v. Leeson, supra, and the corporation has a right to recover for this wrong. The stock was issued to the partnership, and subsequently transferred to the partners, without legal consideration.

The plaintiff has asked for damages for the corporation in the amount of $40,300. This is calculated on the basis of the purported liability to the partnership. The defendants issued a total of 2,000 shares to the partnership on the basis of $20 per share in full satisfaction of the liability. The price of the stock included the $10 par value and $10 contributed surplus. This was also the price for which the stock was issued to the public.

■ The corporation is entitled, under the general principles involved, to recover the market value of the stock at the time the transaction took place. East Tennessee Land Co. v. Leeson, 183 Mass. 37, 66 N.E. 427; 15 Am.Jur., Damages, § 43; A. L. I. Restatement, Torts § 927; 18 C.J.S. Corporations §§ 160, 251. The market value may be determined, among other considerations, by the amount paid in actual transactions which took place at or about the time the stock was issued to the partnership. East Tennessee Land Co. v. Leeson, supra; A. L. I. Restatement, Torts § 911, comment b.

Both before and after the stock was issued to the partnership it was sold to many individuals for $20 per share. This was the price used by the defendants in determining the amount of stock to issue to the partnership. It seems clear that this was the market value. The fact that the corporation was paying a commission on some of the stock sales but did not pay a commission on the issuance of the stock to the partnership, and hence, was receiving in cash less than the amount for which the stock was selling, should not affect the market price of the stock. Neither does the fact that the capital of the corporation was severely impaired (to the extent of $100,000) affect the price at which the stock was selling. Needless to say, it would have affected the selling price if it had been known. But it wasn't known to the general public. The defendants, as directors, caused the company to show on its books an $11,000 surplus. They will not now be heard to say that a deficit, which if it was known to anyone, was known to the defendants, caused the market price to be lower than that which actually prevailed at the time.

It has been suggested by the defendants that the corporation is now estopped to assert its claim because it has continued to accept the benefits of the bargain. As has been indicated, the corporation received no benefit from this bargain that it did not already have. The case of Murray v. Murray Laboratories, Inc., 1954, 223 Ark. 907, 270 S.W.2d 927, cited by defendants is not applicable here. In that case something of value (a formula) was given in exchange for the stock. The state law prohibited issuance of stock for that type of property and for that reason the corporation sued to rescind the sale.

repaid out of borrowed money. * * *
(4) No repayment of such loan shall be

made unless approved by the commissioner. * * * "

The court held that it could not do so without first returning the formula. On the other hand, one state has held that where a corporation issues stock in violation of a constitutional provision, it can sue to recover the stock without returning the consideration received for the stock. Evans v. Ideal Brick & Brikcrete Manufacturing Co., Okl., 1955, 287 P.2d 454. Certainly, where a corporation received nothing for its stock, it has nothing to tender.

 The defendants also claim that the corporation has changed its position, i. e., reorganization, since the issuance of this stock and therefore it is estopped to maintain this action. In order for an estoppel to operate, however, it is the position of the defendants which must have been changed to their detriment. 19 Am.Jur., Estoppel, § 34. The defendants have not changed their position any more than any other stockholders; and what change there was, was to their benefit. If the company had not been reorganized, the defendants probably would have lost everything. As it is, they at least own 1/13th of their original number of shares in a going concern.

 The defendants also contend that whatever liability might be imposed in this action should be several and not joint. I cannot agree. Although the defendants, and to a certain extent, the plaintiff, have regarded this action as one in contract, and, indeed, there may have arisen an agreement in law to pay for the stock, it seems clear that the plaintiff's right to recover is based pri-

marily upon the fraud of the directors acting both as directors and members of the partnership. The stock was originally issued to the partnership. It was thereafter distributed to the partners, both in their capacity as partners and as creditors of the partnership. It would follow that any liability that would attend the issuance of this stock would attach to the partnership. The pertinent provisions of the Utah Code [5] provide that the liability of general partners in situations such as this is joint and several.

 The defendants Wright, Wirthlin and Rich claim that their liability must be limited because the partnership is purportedly a limited one and they were limited partners. Defendant Bullard was the general partner. In order for the liability of partners to be limited there must be substantial compliance with the statute providing for limited partnerships. 68 C.J.S. Partnership § 461; Mud Control Laboratories v. Covey, 2 Utah 2d 85, 269 P.2d 854. Section 48-2-2, Utah Code Annotated 1953 [6] requires that the certificate of partnership be signed and sworn to. This is not a mere formal requirement. There are good reasons why this statement should be sworn to, not the least of which is to bring home to the signers the necessity of the certificate's being true and correct. The partners also contributed services to the partnership and without segregation from authorized contributions as far as is indicated by the partnership agreement, in violation of sections 48-2-2 and

---

5. Utah Code Annotated 1953.
"48-1-10. Partnership bound by partner's wrongful act.—Where by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."
"48-1-12.—Nature of partner's liability.—All partners are liable: (1) Jointly and severally for everything chargeable to the partnership under sections

48-1-10 and 48-1-11. (2) Jointly for all other debts and obligations of the partnership; * * *."

6. Utah Code Annotated 1953.
"48-2-2. Formation. (1) Two or more persons desiring to form a limited partnership shall: (a) Sign and swear to a certificate, which shall state: * * * (enumeration of 14 statements); (b) File for record the certificate in the office of the county clerk * * *. (2) A limited partnership is formed if there has been substantial compliance in good faith with the requirement of paragraph (1)."

48–2–4, Utah Code Annotated 1953 [7]. There were other more technical violations of section 48–2–2 also. These failures are not substantial compliance. Abendroth v. Van Dolsen, 131 U.S. 66, 9 S.Ct. 619, 33 L.Ed. 57.

Even assuming that there had been substantial compliance with the filing statute, the partners would be liable as general partners. Section 48–2–7 [8] provides that if a limited partner takes part in the control and management of the business he will be liable as a general partner. This is in accord with the general rule. 68 C.J.S. Partnership § 478B(4); Holzman v. De Escamilla, 86 Cal.App.2d 858, 195 P.2d 833. In this case the limited partners participated in the management of the partnership. The only business of the partnership was the organization and operation of the corporation. All of the partners actively participated. The defendants did so to the extent of becoming directors of the corporation. They cannot now rely on the form of this legal entity when they have heretofore disregarded the spirit of it. This holding is not intended to adjudicate whatever claims the defendants might have among themselves and the other partners in regard to the limited partnership agreement.

The defendant Rich also interposes the defense that he was not a director either at the time the contract between the partnership and the corporation was entered into or at the time the stock was issued to the partnership. This defense might avail him if he had only been a director, but his liability is also based on his connection with the partnership. He admits that he knew of the contract even while he was a director. He knew and approved the arrangement to have the stock issued to the partnership. He accepted and now holds the fruits of that arrangement. The basis of this action is not only that a group of directors issued themselves stock without paying for it, but also that the purpose of the partnership was to organize, manage, and control the corporation. This it did and it matters not which particular members happened to be directors at any particular time. They were all working for the benefit of the partnership. They all received those benefits. They are all liable for the actions of any partner in furtherance of the partnership purpose.

There is a further defense interposed, the disposition of which requires the recitation of additional facts. Harry D. Pugsley was also joined as a defendant. He was a member of the partnership and director of the corporation during the times in question. Prior to the beginning of this suit, Pugsley brought an action in the Third Judicial District Court of the State of Utah in and for Salt Lake County against the corporation for unpaid fees. The corporation, either orally, or by written pleading (it is not clear which) claimed negligence on Pugsley's part. The case was then compromised and settled and an order entered dismissing with prejudice all claims of the parties. This heretofore has been determined by me to be a valid judgment and summary judgment has been granted on the ground that that case was res judicata here in Pugsley's favor. The other defendants claim discharge of all their liabilities on the basis of this discharge of one of the parties.

The general rule is that judgment in favor of one joint tort-feasor is no bar to an action against another tort-feasor. Old Dominion Copper Mining & Smelting Co. v. Bigelow, supra. This is the rule in Utah. Section 15–4–2, Utah Code Annotated 1953.

---

7. Utah Code Annotated 1953.
 "48–2–4. Character of limited partner's contributions.—The contributions of a limited partner may be cash or other property, but not services."

8. "48–2–7. Limited partner not liable to creditors.—Exception.—A limited partner shall not become liable as a general partner, unless in addition to the exercise of his rights and powers as a limited partner he takes part in the control of the business."

■ Satisfaction of judgment against one of two or more joint and several obligors will bar an action against the remaining obligors. Eberle v. Sinclair Prairie Oil Co., 10 Cir., 1941, 120 F.2d 746, 135 A.L.R. 1494; Green v. Lang Co., 115 Utah 528, 206 P.2d 626. On the other hand, a mere covenant not to sue one joint and several obligor does not release the remaining obligors. McKenna v. Austin, 77 U.S.App.D.C. 228, 134 F.2d 659, 148 A.L.R. 1253; United States v. First Sec. Bank of Utah, 10 Cir., 1953, 208 F.2d 424, 42 A.L.R.2d 951, and cases annotated at 148 A.L.R. 1288.

■ The question is whether the transaction between Pugsley and the corporation was a satisfaction of a judgment or in the nature of a covenant not to sue. I am inclined to believe it was not a satisfaction of a judgment. Most of the cases dealing with that subject consider a situation where the questions of liability and damages have been submitted and a judgment rendered thereon, after which the judgment has been paid and the plaintiff has attempted to recover from a second joint tort-feasor. That is not the case here. The jurisdiction of the Utah court was not exercised to determine the liability of either party or the amount of damages relating thereto. There was no judgment rendered against either party. It merely dismissed with prejudice as to each. This distinction was observed in Dawson v. Board of Education, 118 Utah 452, 222 P.2d 590, 593, where the court said:

"In a true covenant not to sue, the amount of damages is uncertain, the party does not intend to fix the loss by the agreement, and full satisfaction for the damages suffered is not admitted. When, however, the issue has been submitted to a jury and the damages ascertained, the sum is certain, and the acceptance of the amount leaves nothing owing by other tort feasors and nothing to reserve."

In this regard, the instant case is similar to Green v. Lang, supra, where the Utah court held that the forebearance to sue one joint obligor and subsequent dismissal with prejudice did not operate as a bar to an action against the remaining obligors. This is in keeping with the reason behind the rule. Although there can be but one satisfaction for the wrong there should be a full satisfaction. And a technical misstep will not bar the plaintiff as to others when there has obviously not been satisfaction.

■ Whatever has been received by plaintiff, or in this case the corporation, must be applied on the amount of recovery in this case. Green v. Lang Co., supra. The only thing of value that the corporation received was settlement of Pugsley's action. Obviously, this is of some value to the corporation but no evidence was produced by the defendants of its true value and it would be speculation to attempt to value it without evidence.

I conclude, on the basis of the stipulated facts, and the additional findings herein, that the plaintiff may properly bring this derivative action. The clerk is, therefore, directed to enter judgment in favor of the Life Insurance Corporation of America in the amount of $40,000, plus interest on $12,260 from March 25, 1954, on $25,000 from April 11, 1954 and $2,740 from August 24, 1954, plus costs. A remittitur will be filed upon seasonable motion and satisfactory proof by the defendants of the value to the corporation of the settlement of Pugsley's suit, together with interest from March 7, 1957.