Merrill OSBORNE *v.* Wiley Wayne WORKMAN et al

81-36                                                 621 S.W. 2d 478

Supreme Court of Arkansas
Opinion delivered September 28, 1981

*Oscar Fendler* and *Bill W. Bristow,* for appellant.

*John B. Mayes,* for appellees.

STEELE HAYS, Justice. The primary issue ·presented by this appeal is whether under the Uniform Partnership Act one partner can terminate a partnership created for an indefinite term where the partnership agreement provides for its continuation until "dissolved mutually or by law." We are asked to reverse the trial court's refusal to dissolve a partnership or to nullify a provision of the agreement that a withdrawing partner forfeits his interest in the accounts receivable. We affirm the holding and decline to nullify the provision.

The parties are all doctors. In 1966 the appellant joined other doctors in forming a medical clinic. Their partnership agreement specified no definite term, only that it would continue "until said partnership is dissolved mutually or by law." If a doctor withdrew he was to be paid his percentage of the assets, *excluding* accounts receivable. When the partnership was formed, the clinic's accounts receivable were $105,679.00 and were treated as an asset of the partner-

ship. The accounts gradually increased as some seven doctors withdrew and new ones entered and by 1979 aggregated $513,934.00.[1] With one exception,[2] the withdrawing partners received nothing for their share of the accounts.

In August 1978 Dr. Osborne decided to leave the firm. The matter was discussed at several partnership meetings. He insists that he never intended to leave without his share of the accounts but just when, or if, he made that condition known to the others is not clear from his testimony, which is emphatically denied by theirs. By early 1979 he had settled on the old Chickasawba Hospital, being renovated, and said he would try to be out by July 1. It is clear that arrangements for another doctor to replace Dr. Osborne were linked to his withdrawal. He changed his office address and telephone number in the Blytheville telephone directory, and handed out notices to his patients that around July 1 he would be moving to the new location and would be "in solo practice." The July 1 deadline was later moved to July 31 due to a delay in the renovation.

On June 27 Dr. Osborne filed suit to dissolve and liquidate, alleging that the partnership was not for a definite term but until "dissolved mutually or by law" and, thus, was subject to dissolution at the will of any partner under the Uniform Partnership Act. Ark. Stat. Ann. §65-131 (Repl. 1980). He asked for dissolution, termination, and the appointment of a receiver to wind up the partnership. Trial was concluded on March 6, 1980, and the chancellor announced his finding, but entry of the decree was deferred until August 26.

Appellant contends that dissolution should have been ordered under § 65-131, entitled "Causes of Dissolution," which provides some nine instances of dissolution by operation of law, including the express will of any partner where no definite term is specified in the agreement. The agreement here did not provide for a specific term; hence it is

[1]Estimates of collectibility varies, from c. $100,000 to c. $400,000.

[2]In 1968 one doctor was asked to withdraw due to undisclosed circumstances; with the approval of all partners he received a part of his accounts receivable.

urged that any partner could dissolve the partnership at will. But the argument fails in two respects: It ignores the precondition clearly stated in § 65-131, that the section applies "without violation of the agreement between the parties;" and it fails to consider what was intended by the partnership agreement itself. Moreover, § 65-129 defines dissolution:

> The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business; provided that this change in the relation of the partners shall not effect a dissolution of the partnership *in contravention or violation of the agreement between the partners*. (Emphasis supplied.)

Self-limiting language appears throughout the UPA which renders it "subject to any agreement to the contrary." [See Ark. Stat. Ann. §§ 65-118, 65-119, 65-129, 65-131, 65-137, 65-140, 65-142 (Repl. 1980).] Even the section for the settling of accounts after dissolution and winding up, which provides the method of distribution among the partners, is "subject to any agreement to the contrary." The clear intent of the UPA to defer to any existing partnership agreement is recognized in two cases cited by appellees, *Frank v. R. A. Pickens & Son Co.*, 264 Ark. 207, 572 S.W. 2d 133 (1978), and *Devlin v. Rockey*, 295 F. 2d 266 (7th Cir. 1961). In *Devlin* the Seventh Circuit, interpreting the Illinois UPA, held that two doctors who dissolved a medical partnership without definite term were only entitled to the interest due a withdrawing partner under the partnership agreement and *not* in accordance with the provisions of the Act. In *Franks* we held that a partner whose interest was terminated at the will of the managing partner could not dissolve and liquidate the partnership where there was an oral agreement that a terminated partner would receive only his interest in the firm's capital account.

Turning to the agreement itself, we note that in construing the agreement we are governed by what the parties *intended. Asimos* v. *Reynolds*, 244 Ark. 1042, 429

S.W. 2d 102 (1968); *Scrinopski* v. *Meidert*, 213 Ark. 336, 210 S.W. 2d 281 (1948). Appellant contends that the wording "until said partnership is dissolved mutually or by law" triggers that provision in § 65-131 giving any partner the right to dissolve at will. Certainly any partner can withdraw at will and to the extent that withdrawal is a dissolution he is correct. But appellant seeks dissolution in its fullest sense, i.e., the termination of the partnership by liquidation, and we cannot agree these partners intended such a result. We think the clear intent was that dissolution by termination would occur only by *mutual* agreement and not by the unilateral act of a single partner. Appellant's contention cannot be reconciled with the words "mutually dissolved," as the dissolution could be achieved by a single partner — the reverse of mutual. It is undisputed that seven doctors withdrew over the years and the partnership retained all of the accounts receivable and in determining what the parties intended reference is had to what they did. *McPhail* v. *Laughrun*, 214 Ark. 276, 217 S.W. 2d 244 (1949); *American Snuff Co.* v. *Stuckey*, 197 Ark. 540, 123 S.W. 2d 1063 (1939). It is inconceivable that six doctors would form a partnership, enter into an elaborate agreement intended to promote longevity, set up a common practice, pool their equipment, records, and resources, and intend that any one of them could end it at any time by demanding dissolution and liquidation.

The same issue was considered and answered in the case of *Adams* v. *Jarvis*, 127 N.W. 2d 400 (Wisconsin 1964) which has striking similarities to this case: Nine doctors formed a medical partnership with an identical provision, i.e., that in the event any partner withdrew from the partnership the accounts receivable remained the sole property of the remaining partners. Two doctors withdrew and claimed they were entitled to a share of the accounts receivable under the dissolution section of the Act. The lower court agreed, but the Supreme Court reversed, with the following language:

> Persons with professional qualifications commonly associate in business partnerships. The practice of continuing the operation of the partnership busi-

ness, even though there are some changes in partnership personnel, is also common. The reasons for an agreement that a medical partnership should continue without disruption of the services rendered are self evident. If the partnership agreement provides for continuation, sets forth a method of paying the withdrawing partner his agreed share, does not jeopardize the rights of creditors, the agreement is enforceable. The statute does not specifically regulate this type of withdrawal with a continuation of business. The statute should not be construed to invalidate an otherwise enforceable contract entered into for a legitimate purpose.

In the alternative, appellant urges that the agreement with respect to the accounts receivable should be nullified because of public policy. We have considered the arguments and do not find sufficient merit to warrant overturning a provision these parties not only accepted and observed, but under which they benefitted, over a long period of time. It would only lengthen this opinion unnecessarily to deal with each one in detail. It is said the agreement resembles a Tontine contract, but this appears to have been raised initially in a motion to reopen the case filed in August, some five months after the trial. It is said the agreement operates to lessen competition in the medical profession, but we find no evidence to support the assertion and we have no way of gauging its merit. Appellant claims that third-party payment by Medicare and Medicaid has created changed conditions and equity should no longer uphold the agreement. But third-party payment was not unknown in 1966, as insurance, workers' compensation and welfare frequently used that method. We think the change in conditions not so great as to render the agreement unenforceable. Appellant also states that the provision results in a forfeiture, which equity abhors. There may be some similarity, but it can also be said that appellant benefitted by the partnership retaining the accounts as others withdrew, and it would be inequitable to permit one party to profit by his agreement and then repudiate it when it no longer serves his purpose. *Murray* v. *Murray Laboratories, Inc.*, 223 Ark. 907, 270 S.W. 2d 927 (1954).

Finally, appellant argues that the chancellor should have reopened the case on his motion. We are not persuaded that he was compelled to do so, as all trials must reach an end, and the trial court's discretion is the better gauge of when that occurs. Subsequent events of themselves are seldom a sufficient cause for reopening, or finality would never be achieved. We find no abuse of discretion in the chancellor's denial of the motion. Appellant insists that the chancellor somehow erred in connection with the accounts receivable for June and July; we are unable to follow the argument and the cited discourse from the record provides no help. We are left to assume that the decree as entered is consistent with his findings. Evidently the clinic's billing procedures were slow, but that condition seems to have been chronic rather than deliberate.

In conclusion, where competent parties knowingly enter into an agreement suited to their purposes, keep that agreement in effect over many years to their mutual benefit, it is not for the courts to nullify such agreement where public policy is not impaired. *Arkansas Fuel Oil Co.* v. *Scaletta*, 200 Ark. 645, 140 S.W. 2d 684 (1940).

The decree is affirmed.